MRS. NAYTINE J. MARRON, Appellee, v. B. M. SCARBROUGH, Appellant. —314 S. W. (2d) 165.

Western Section, Jackson. January 17, 1958.

Certiorari denied by Supreme Court June 6, 1958.

416

Taylor, Costen & Taylor, and Lloyd C. Kirkland, Jr., Memphis, for appellant.

Davis & Davis, and L. E. Gwinn, Memphis, for appellee.

BEJACH, J. This cause involves an appeal in the nature of a writ of error by B. M. Scarbrough, who was defendant in the lower court, from the verdict of a jury and decree entered thereon in the Chancery Court of Shelby County, Tennessee, against him and in favor of Mrs. Naytine J. Marron, who was complainant in the lower court. For convenience, the parties will be styled, as in the lower court, complainant and defendant, or called by their respective names. During the latter part of 1952, complainant and defendant were negotiating for the sale by complainant to the defendant of 9½ acres of land on or near the Raleigh-LaGrange Road in Shelby County, Tennessee, which was at that time owned by complainant and which was part of and adjacent to the tract on which her home stands. It was the contention of complainant that she and the defendant agreed that the 9½ acres to be sold to him would be used for subdivision purposes only, and that no gravel should be mined from same except for the purpose of constructing streets in such subdivision, and that any pits resulting from such removal of gravel would be filled and leveled. On January 14, 1953, defendant went to the office of Mr. Wils Davis, an attorney of the Memphis Bar, where complainant was employed as secretary, for the purpose of entering into a contract for the sale by complainant of the 9½ acres which is involved in this law suit. After some discussion, in which defendant refused to agree to the restrictions insisted on by complainant, and especially to the permanent imposition of such restrictions, in which discussion complainant's employer, Mr. Wils Davis, a prominent member of the Memphis Bar, partici-

pated, the following restriction was dictated by Mr. Davis to complainant and typed by her into the contract which was then signed by both complainant and defendant, to wit:

"It is understood and agreed that this property is to be conveyed subject to the following restrictions: For a period of ten years, no gravel plant shall be established upon said premises and, in the event any gravel is removed from said premises, then in that event, the holes and pits that are opened up for the purpose of taking gravel therefrom shall be filled and leveled so that the property can be used for residential purposes."

Sometime prior to February 3, 1953, complainant, herself, typed and delivered or had delivered to Mr. Robert E. Joyner, a Memphis attorney who examined the title for defendant, a warranty deed which conveyed the 9½ acres here involved to defendant. The restrictive agreement which had been incorporated in the contract of sale was omitted from this warranty deed. Neither defendant nor his attorney had anything to do with the preparation of the deed. This deed was filed for record February 17, 1953, and is recorded in Record Book 3069, page 333, in the Register's Office of Shelby County, Tennessee. Defendant has held title to the land thereby conveyed since that date. On or about April 11, 1955, defendant, Scarbrough, entered into a lease agreement with the Memphis Stone and Gravel Company, which company was joined as a defendant in the lower court. The final decree dismissed complainant's suit as to said company, and no appeal has been taken from that part of the decree; consequently, the Memphis Stone and Gravel Company is no

longer involved in this litigation. Under the terms of the lease, which included other lands of defendant adjoining same, the Memphis Stone and Gravel Company was granted the right to mine and remove gravel. Said company thereupon proceeded to mine and has continued to mine and remove gravel from the 9½ acres of land involved in this suit, although this was done over the protest of complainant. In a separate contract entered into between defendant and one Walter Shepard, the latter was employed to fill and level the holes and pits left by the digging operations. The gravel removed from said 9½ acres has been and is being processed at a gravel plant located in that vicinity but not on defendant's land.

Complainant filed her original bill in this cause November 22, 1955. Complainant's bill alleges that in the negotiations prior to the drafting of a contract for the sale of the land in question, she and the defendant agreed:

"That for a period of ten years no gravel would be mined or removed from said premises, unless said property was opened for residential subdivision purposes, and then only such amount as would be necessary for building streets in said subdivision, and, if any gravel was so removed, the holes or pits that were opened up by the removal thereof would be filled and leveled so that the property could be used for residential purposes."

The bill alleges that it was the intention of the parties that this understanding and agreement should be embodied in the deed of conveyance; but that when the deed was prepared, executed and delivered, the said agree-

ment was inadvertently omitted from said deed. Neither the deed nor the contract of sale were exhibited with the bill. The bill prays for reformation of the deed but not of the contract of sale.

A copy of the deed was attached as an exhibit to defendant's answer, whereupon, leave of court having been obtained, complainant filed an amended and supplemental bill which alleges that in the contract of January 14, 1953, complainant intended to restrict defendant in accordance with the restrictive agreement alleged by complainant in her original bill, and that such agreement was inadvertently omitted from the deed. The amended and supplemental bill also alleges a breach by defendant of the contract of sale. It alleges, also, that such agreement was inadvertently omitted from the deed, and that in drafting the contract of sale, the term ''gravel plant'' was used to cover all operations in connection with the removal of gravel. It also alleges fraud on the part of defendant, in that the term ''gravel plant'' was used by him in a technical sense not understood by complainant. A photostatic copy of the contract of sale is exhibited with the amended and supplemental bill, which alleges mutual mistake in the preparation of the deed and alleges that omission of the restrictive agreement from the deed was due to inadvertence on the part of complainant. The amended and supplemental bill prays for construction of the contract in accordance with the contention of complainant and, in the alternative, prays that the contract and the deed by reformed.

Defendant's answer to the amended and supplemental bill denies any fraud on his part, or any superior knowledge, and alleges that the contract was drawn by com-

plainant's attorney. It also denies any oral agreement different from the agreement contained in the written contract of sale. Thereafter, on January 15, 1957, complainant filed an amendment to the amended and supplemental bill, which alleges that it was the intention of the parties to embody in the deed the agreement made at the time of entering into the written contract of sale, worded as now contended for by complainant, and alleges mutual mistake as a ground for reformation.

At the hearing, the Chancellor on his own motion impaneled a jury and submitted to the jury the following issues of fact, which, together with the jury's answers thereto, are as follows:

## "I.

"Was the sale of the land sold by the complainant Mrs. Naytine J. Marron, to the defendant, B. M. Scarbrough, conditioned upon an express agreement between those parties that:

"For a period of ten years no gravel would be mined or removed from said premises, unless said property was opened for residential subdivision purposes, and then only such amount as would be necessary for building streets in said subdivision, and, if any gravel was so removed, the holes or pits that were opened up by the removal thereof would be filled which, by mistake or inadvertence, was not included in the contract of sale dated January 14, 1953?

"Answer 'Yes' or 'No': Yes.

## "II.

"Has a 'gravel plant' been established on the land sold by the complainant to the defendant, B. M. Scarbrough?

"Answer 'Yes' or 'No': No.

"If your answer to Issue No. I and II is 'no', it is not necessary to answer Issue No. III. If your answer to Issue No. I or II is 'Yes', you will answer Issue No. III.

"What damages, if any, have been sustained by the complainant by any breach of contract of the defendant, B. M. Scarbrough?

"Answer in dollars and cents or the use of the word 'None':

"$2,800 Twenty eight Hundred Dollars."

Although the learned Chancellor denied a motion by defendant to include in Issue No. 1 submitted to the jury a finding that same was omitted from the contract of sale by reason of *mutual mistake*, which action of the Chancellor is assigned as error in this Court, nevertheless, the Chancellor held, as is stated in the recital part of the final decree, "that by mutual mistake the contract between complainant, Mrs. Naytine J. Marron, and the defendant, B. M. Scarbrough, did not contain the real intention of the parties, in that it failed to contain the following provision:"—which is followed by quoting the language of Issue No. I, as found by the jury. Said final decree also provides in the recital part of same that "said provision was the real intention of the parties, and which provision should have been carried forward in the deed

executed and delivered to the defendant B. M. Scarbrough by the complainant''. Said decree, in its decretal part, adjudges that complainant recover the sum of $2,800, together with all costs of this cause, and that ''the verdict of the jury is in all findings approved''. The decretal part does not, however, order a reformation of either the contract of sale or the deed.

After defendant's motion for a new trial had been overruled, defendant prayed and was granted an appeal in the nature of a writ of error, prepared and filed a bill of exceptions which embodies all of the testimony heard in the trial of this cause,—same having been tried by stipulation on oral evidence,—and perfected his appeal to this Court. In this Court, as appellant, defendant has filed four assignments of error, which are as follows:

''Assignments of Error and Brief

''I. *Errors of Law Relied On:*

''1. The Court erred in submitting, over defendant's objection, issue of fact number one to the jury and the Court further erred in approving and confirming the jury's verdict on this issue (Tr. 44, 45, 248). The law is clearly stated and settled that mere 'mistake or inadvertence' does not constitute grounds for reformation of a written contract; that there must be 'mutual mistake' or 'mistake of one party influenced by fraud of the other party'. Pittsburg Lumber Co. v. Shell, 136 Tenn. 466 [189 S. W. 879]; Jones v. Jones, 150 Tenn. 554 [266 S. W. 110]; Walker v. Walker, 2 Tenn. App. 279; Woodfin v. Neal, 16 Tenn. App. 481 [65 S. W. (2d) 212]; 2 Pomeroy on Equity (3d Ed.) Section 839.

"2. The Court erred in denying defendant's motion to submit a proposed issue number I, which was as follows:

" 'Was the sale of land sold by the Complainant, Mrs. Naytine J. Marron, to the defendant, B. M. Scarbrough conditioned upon an express agreement between those parties that:

" 'For a period of ten years no gravel would be mined or removed from said premises, unless said property was opened for residential subdivision purposes, and then only such amount as would be necessary for building streets in said subdivision, and, if any gravel was so removed, the holes or pits that were opened up by the removal thereof would be filled and leveled so that the property could be used for residential purposes,

" 'which, by *mutual mistake,* was not included in the contract of sale dated January 14, 1953?' (Tr. 248 and 258).

"This proposed issue correctly states the law to the effect that mutual mistake is required as a basis for reformation of a written instrument. Pittsburg Lumber Co. v. Shell, 136 Tenn. 466 [189 S. W. 879]; Jones v. Jones, 150 Tenn. 554 [266 S. W. 110]; 2 Pomeroy on Equity (3d Ed.) Section 839.

"By submitting issue number I and by declining to submit the proposed issue number I, the jury was permitted to bring in a verdict which was founded on the inadvertence or carelessness of the plaintiff; this is not a basis for reformation and this is a fatal error.

"II. *Errors of Fact Relied On:*

"1. The Court erred in finding, and in approving the jury's finding that the complainant, Mrs. Naytine J. Morron, and the defendant, B. M. Scarbrough, had reached an express agreement as follows:

" 'For a period of ten years no gravel would be mined or removed from said premises, unless said property was opened for residential subdivision purposes, and then only such amount as would be necessary for building streets in said subdivision, and if any gravel was so removed, the holes or pits that were opened up by the removal thereof would be filled and leveled so that the property could be used for residential purposes'.

"(1) The parties entered into a written contract, drawn by complainant and her attorney, dated January 14, 1953, containing a restriction which covers the same subject matter but which is diametrically opposed to the terms of the alleged oral agreement (Tr. 4, 21, 57, 60, 71).

"(2) Neither the testimony of the complainant or her only witness, Wils Davis, establishes the alleged agreement by evidence which is clear, cogent and convincing proof, or clear and indisputable proof, which is the standard of proof required in reformation suits (Tr. 58-64, 89-95, 110, 71).

"(3) Defendant, B. M. Scarbrough, positively denies that he entered into any agreement with complainant other than the written contract dated January 14, 1953 (Tr. 180, 203, 218-221).

"(4) The subsequent conduct and acts of defendant support his position and insistence that the written contract dated January 14, 1953, is the only agreement he ever made or entered into with complainant:

"(a) Defendant told Shepard about the written agreement that no gravel plant could be erected on the 9½ acre tract (Tr. 184, 241).

"(b) Defendant told complainant that he considered himself to be acting within his rights (Tr. 98, 185).

"(c) Defendant has contracted with Shepard to fill and level the holes and pits left by the mining operations. This was prior to the filing of the lawsuit, and said holes and pits are being filled and leveled (Tr. 187-191, 216, 235, Exhibits 12A, B, C).

"(d) Defendant at the time of entering into the lease with Memphis Stone & Gravel Co. had an agreement and lease that they would put a gravel plant on property other than subject property (Tr. 215, 224).

"2. The Court erred in finding that by *mutual mistake* the contract between complainant and defendant did not conform to the real intention of the parties.

"(1) The restrictive clause in the written contract was drawn by Wils Davis, attorney for complainant; defendant had nothing to do with its phrasing or terms (Tr. 60, 71, 93, 110).

"(2) If there was a mistake, it was not a *mutual mistake* as the pleadings and testimony indicate that both complainant and her attorney erroneously thought that the term 'gravel plant' covered gravel mining and all gravel mining operations, while defendant never thought or intended for this term 'gravel plant' to cover gravel mining.

"(a) Complainant alleged that she understood the term 'gravel plant' to include 'gravel mining' (Tr. 18, 19).

"(b) Wils Davis testified that he thought that the term 'gravel plant' included digging operations of all kinds (Tr. 58, 61, 64).

"(c) Defendant denied that the term 'gravel plant' was used to cover any and all operations in the removal of gravel and testified that it was not then or now so understood by him (Tr. 23, 185, 187, 193, 219, 220).

"(d) The Chancellor found that Scarbrough had no part in the *mistake* (Tr. 38).

"(e) The jury found that there was no 'gravel plant' on the 9½ acres (Tr. 30).

"3. The Court erred in approving the damages awarded as these damages are excessive. The damages must be founded on *nuisance* and the sum of $2,800 is an excessive award for a nuisance.

"(1) The gravel pits are not permanent; they are being filled and leveled. All witnesses testify that complainant's property will not be permanently damaged (Tr. 136, 137, 170).

"(2) There would be a *nuisance* in the immediate vicinity anyway, even if no pits were opened on the 9½ acres, as there are gravel pits and operations on the adjoining property over which complainant has no control (Tr. 116, 117, 141, 142, 160, 163).

"(3) The gravel operations on the 9½ acres are at least 400 feet from complainant's house, and complainant is not at home during the time the pits are being worked (Tr. 103, 107).

"III. *Errors of Court Upon Motions:*

"1. The Court erred in denying defendant Scarbrough's motion made at the conclusion of complainant's proof, and renewed at the conclusion of all the evidence, to withdraw all issues of fact from the jury (Tr. 149, 248). The grounds for this motion were that there were no allegations of fraud, accident, or mutual mistake, nor any explanation as to how this alleged oral agreement failed to be placed in said written contract, and another agreement inserted instead.

"(1) A written instrument can only be reformed in equity upon an allegation of fraud, accident or mistake, and the pleader must show that he was without fault. Ellis v. Bruce, 5 Tenn. [App.] 344; Self v. Harmon, 1 Tenn. Cas. (Shannon) 74; Reams v. Board, 153 Tenn. 408 [284 S. W. 382].

"(2) Complainant attempts to allege 'fraud' in the execution of the contract, but there is no proof of either fraud or mutual mistake; there is simply no explanation at all as to why the restrictive clause was

written as it was, rather than according to the terms of the alleged oral agreement; and the jury's verdict is based on mistake or inadvertence, rather than fraud (Tr. 43).

"2. The Court erred in overruling defendant's motion for judgment notwithstanding the verdict of the jury (Tr. 45).

"(1) All negotiations and agreements prior to the written contract dated January 14, 1953, were merged in said written contract as a matter of law, except where there is fraud, accident or mutual mistake. There are allegations of fraud with respect to the execution of the written contract dated January 14, 1953, but no proof thereof; there are neither allegations nor proof of *mutual mistake* in the execution of said written contract; therefore all these prior negotiations merged into the written contract. Frumin v. May, 36 Tenn. App. 32 [251 S. W. (2d) 314]; Fuller v. McCallum & Robinson, 22 Tenn. App. 143 [118 S. W. (2d) 1028]; Wood v. Goodrich, 17 Tenn. 266; American Fruit Growers v. Hawkinson, [Inc.], 21 Tenn. App. 127 [106 S. W. (2d) 564].

"3. The Court erred in overruling defendant's motion for a new trial (Tr. 45).

"(1) The preponderance of the evidence was against the verdict.

"(a) Neither complainant nor her witness ever testified that the alleged oral agreement was entered into, or that there was a meeting of the minds as to the terms set out in the alleged oral agreement (Tr. 58-64, 89, 93).

"(b) Defendant denied that he agreed to any such oral agreement (Tr. 180, 203, 218-221).

"(c) The parties actually entered into and executed a formal written instrument drawn by complainant and her attorney (Tr. 4, 21, 60, 71).

"2. There is a fatal variance between the allegations of fraud made by complainant and the proof that was presented; the jury based its findings on the grounds of mistake or inadvertence, and the Court upon mutual mistake. The law requires both allegations of and clear and convincing proof of the mutual mistake. Myrick v. Johnson, 25 Tenn. App. 483 [160 S. W. (2d) 185].

"IV. *Errors of Court in Admission of Evidence:*

"1. The Court erred in admitting the testimony, over defendant's objections, of Wils Davis, Mrs. Naytine J. Marron and B. M. Scarbrough concerning the discussions, oral negotiations and alleged verbal stipulations anterior to or contemporaneous with the execution of the written contract for sale dated January 14, 1953, and in particular the testimony of Wils Davis and Mrs. Naytine J. Marron wherein they were allowed to state that in the negotiations which took place in the office of Wils Davis prior to the execution of said contract, defendant B. M. Scarbrough represented that he desired to remove the gravel for use on the streets in a proposed subdivision and that Mrs. Naytine J. Marron stated that she would not sell said property if there were to be any kind of gravel operations on said property (Tr. 60-63, 87-93, 219).

"2. Restrictive covenants affecting land must be in writing and signed by the parties to be changed, or said restrictive covenants will be barred by the Statute of Frauds. Lenzi v. Colberg, 13 Tenn. App. 535; Annotation in 5 A. L. R. (2d) 1316.

"3. All evidence of verbal negotiations or stipulations prior to the execution of the instrument which contradicts, alters, or varies the terms of the written instrument is clearly barred by the parol evidence rule. McGannon v. Farrell, 141 Tenn. 631 [214 S. W. 432]; Le[i]tterer v. Wright, 151 Tenn. 210 [268 S. W. 624]; McQuiddy Printing Co. v. Hirsig, 23 Tenn. App. 434 [134 S. W. (2d) 197]".

These assignments of error need not be taken up and discussed separately. To a considerable extent, they overlap each other. In any event, the assignment of error that the Chancellor erred in denying defendant's motion to withdraw the issues from the jury and dismiss complainant's bill, in our opinion, presents for determination by this Court all questions which either have been or can be presented on the record of this cause. Although, as is held in this opinion, the Chancellor should not have dismissed complainant's bill, nevertheless, in our opinion, he should have withdrawn the issues from the jury, construed the contract of January 14, 1953 on the basis of the evidence before him, and entered a decree such as is being ordered in this Court. Also, the assignment of error, that the Court erred in overruling defendant's motion for a decree notwithstanding the verdict of the jury, presents the same questions for adjudication by this Court. This being an equity case, the scope of such motion is somewhat broader than would be a motion for

judgment non obstante veredicto in a Law Court. As is stated in Gibson's Suits in Chancery (5th Ed.) Sec. 588:

"Either party may move the Chancellor for a decree notwithstanding the verdict of the jury. While somewhat analogous to a motion for judgment non obstante veredicto, the Chancellor is not entirely confined to the pleadings as are Judges in the Law Court. For he may look to the evidence as well as to the pleadings, and if from a view of the cause as an entirety the party in whose favor the verdict was rendered is not entitled to a decree, it should be denied him."

 Subsidiary questions involved are:

1. Whether or not the evidence offered in support of complainant's contentions was clear, cogent and convincing.

2. Whether or not parol evidence was admissible to contradict either the terms of the deed or the contract of sale which preceded same.

3. Whether or not oral agreements, if any, between the parties, made prior to the execution of the written contract of sale, were superseded by said contract, which in turn became merged in the deed.

4. Whether or not the evidence offered by complainant was sufficient to warrant a finding of mutual mistake.

5. Whether or not the contract and deed, having been drawn by complainant and her attorney, should be construed most strongly against complainant.

The defendant in this cause pleaded the Statute of Frauds as a defense to complainant's suit; but we need not consider this defense because, if complainant is entitled to have the deed or the contract of sale reformed by decree of a Court of Equity, the decree of reformation may properly be granted on oral evidence. The law is well settled in Tennessee, however, that in order to warrant reformation of an instrument on the ground of fraud or mistake, the evidence must be *clear, cogent* and *convincing*. This rule is sometimes stated that the proof must be *clear, certain* and *satisfactory,* or *clear* and *conclusive,* or *clear, certain* and *satisfactory* so as to place the propriety of reformation beyond reasonable controversy. Bailey v. Bailey, 27 Tenn. 230; Davidson v. Greer, 35 Tenn. 384; Jones v. Jones, 150 Tenn. 554, 266 S. W. 110; Henderson v. Henderson, 159 Tenn. 126, 17 S. W. (2d) 15; Greer v. J. T. Fargason Grocer Co., 168 Tenn. 242, 77 S. W. (2d) 443, 96 A. L. R. 1141. In the case of Hunt v. Hunt, 169 Tenn. 1, 80 S. W. (2d) 666, in an opinion written by Mr. Chief Justice Green, the Supreme Court held that the question of whether there was clear and convincing evidence was for the Court to decide. The testimony in the instant case, even if same be treated as properly admissible in evidence, does not, in our opinion, quality as clear, cogent and convincing, or clear and satisfactory proof, and certainly does not rise to the dignity of placing the propriety of reformation beyond reasonable controversy.

From the testimony of Mrs. Marron given on direct examination, we quote:

"Q. Now, Mrs. Marron, after you had occupied that property for some time, were you approached by

Mr. Scarbrough concerning the purchase of the property lying in the rear of the house or to the north of the property you retained? A. I was.

"Q. Tell the Court and jury under what circumstances that occurred or what were the circumstances upon that *occurence*. A. The first time that Mr. Scarbrough—I don't know that he exactly discussed buying it from me then—but discussed that property was when he and his wife made a call at my house and discussed the possibilities of a subdivision up there, and I showed them a little plat that I had drawn trying to see whether I by myself could subdivide that property and develop it and sell it, because I only wanted the two and a half acres around the house. That is all I wanted to own permanently.

"Q. Had you ever met Mr. Scarbrough before that visit? A. I don't know.

"Q. But you didn't know him before that time well? A. No, I didn't know him well. I didn't know him at all before I moved out there, but I had made some inquiry about the possibility of subdividing back there before I even bought the property, but not of him.

"Q. When was the next time you discussed the sale and purchase of that property? A. I think Mr. Scarbrough came over to the house and discussed buying it from me, in fact I had sort of abandoned the idea— I think he owned some land back there and said something about if he could get some more. The first conversation was all kind of vague, but he definitely

wanted to buy my property the second time. And I said, I don't know whether you want it or not. I would have to have five thousand dollars for that property, and he immediately said he would pay me that for it.

"Q. At that time was there any gravel operation going on with other property he owned back there? A. I am not saying definitely he had, but it seemed like he owned some or was expecting to get some that maybe could be combined with that part I owned, what I wanted to sell or didn't want to use personally. Are you asking whether there was any gravel operations?

"Q. Was there any gravel operation going on, on any property connected to the nine and a half acres at the time of the discussion you just described? A. No.

"Q. Your answer is, no? A. Not connecting there, no.

"Q. I believe you said you are not positive that he owned that property at that time? A. I am not.

"Q. Do you know whether or not he has since acquired some other property that does lie contiguous to the nine and a half? A. Yes, he has from several different sources.

"Q. During the conversation just related, which I believe would be the second conversation you had concerning the sale of the property, was there any mention of any gravel operation? A. No..

"Mr. Kirkland: Your Honor please, I want to object to her testifying as to these prior negotiations at this time?

"The Court: Why?

"Mr. Kirkland: I believe it violates the parole rule and also all these prior negotiations merged into the written instrument.

"The Court: The objection is overruled.

"Q. Your answer was, no? A. That's right.

"Q. There was no mention of any gravel operation? A. No.

"Q. Was there during the second discussion had any further discussion concerning subdivision for residential purposes? A. I can't remember any definite conversations, but it was the understanding that is what he was buying it for.

"Mr. Kirkland: I object to her testifying what the understanding was. She has no way of knowing what he understood.

"The Court: What I understood, Mr. Davis, you asked her about the conversation. I thought she was detailing a conversation.

" (Whereupon the court reporter read the answer: Answer: 'I can't remember any definite conversation, but it was the understanding that is what he was buying it for'.)

"The Court: That answer will be stricken from the record and the jury will disregard it entirely.

"Q. During that second conversation, Mrs. Marron, do you recall whether there was any discussion concerning subdivision for residential purposes? A. I don't know how to answer it.

"Q. If you don't recall, you don't recall, but what do you remember about it? A. I only remember that he was buying it for subdivision purposes.

"Q. And that was the occasion when you said you would take five thousand dollars for the property? A. That's right.

"Q. And he accepted that at that time? A. That's right.

"Q. What occurred subsequent to that; when was the next meeting you had with Mr. Scarbrough concerning the property? A. When he came to Mr. Davis' office to sign the contract.

"Q. That was the next meeting? A. Yes.

"Q. Who had prepared it? A. I had.

"Q. Was it prepared at that time in the form in which it was signed? A. No, sir, it wasn't.

"Q. Now, you said Mr. Scarbrough came to the office? A. That's right.

"Q. Was anyone with him? A. No.

"Q. What happened when he came to the office? A. Well, the contract that I had prepared was for—

"Q. Excuse the interruption. When he came into the office, did you take him into Mr. Wils Davis' office? A. Yes, I did.

"Q. Did the three of you then have a discussion concerning the contract? A. That's right.

"Q. Did you present the contract that you had prepared to Mr. Scarbrough for his study? A. I did. And do you want me to go ahead?

"Q. Yes. I want you to tell us as nearly, step by step, what occurred in the conversation that took place concerning the clause in the contract. A. Well, of course I can't remember—

"Mr. Kirkland: I believe I can save time. I would like to object on the same basis we have been objecting to the testimony on this particular subject, so that we won't be interrupting all the time.

"The Court: The Court will overrule your objection and the Court will further state for the benefit of the record that it is understood that you are objecting to all like or similar testimony and that it is understood that your objections will stand, and the Court will make the ruling which it did. I think possibly counsel opposing you might require the objection to each question.

"Mr. Gwinn: Now, will you as nearly in detail as you can tell what occurred at that meeting there in Mr. Davis' office? A. I took in the copy, the contract, the copy of the contract that I had prepared, and in that contract I had the provision that the property was to be used for residential, subdivision purposes only. Mr. Scarbrough demurred at that and said— I can't repeat the exact words—but he said that, for instance, if there was gravel on that property he would like to have the privilege of using what was

needed right there for that subdivision, for the streets or the roads in that subdivision. Well, that sounded reasonable to me at the time, and I have since been advised it would be less cheaper—

"Q. Don't tell what you have been advised. A. So, I acceded to that. I wrote another restriction clause which had no time limit and he said, then, that while he expected to build this subdivision something could come up to prevent him from ever building a subdivision, and that he would hate to have a permanent restriction against the land in case he had to sell it or sometime in the future decided to sell it, and then is when this restriction clause—restricting clause that was in the contract was written.

"Q. Mrs. Marron, before this meeting did you know that at some time in the past there had been some gravel operations carried on in the vicinity? A. Yes, I found east of my place or possibly halfway between my place and Covington Pike and Raleigh-LaGrange, Road, and quite a bit back from the highway, there was an old gravel plant that had been operated by Mr. Scarbrough, at least was on his land.

"Q. I was going to ask you the next question, if you know whether or not he had been in it. A. Yes, it was his land.

"Q. Did you, during the course of this conversation, or this conference had in Mr. Davis' office,— did you ever make any statement, any positive statement to Mr. Scarbrough about the sale of the land

in connection with a gravel pit? A. Yes, I certainly did. I said I wouldn't sell the land at all if they had to have a gravel operation on it. I wouldn't think of selling it for that purpose.

"Q. You said that to Mr. Scarbrough in your office that day? A. Yes. Because I had in my mind the ugliness of the situation down at the old gravel pit which was practically exhausted, and I certainly didn't want to be the means of starting up another eyesore in the community.

"Q. Did you convey that meaning to Mr. Scarbrough at that time? A. I don't know whether I said I didn't want to be the means of starting up another one, but I said I didn't want to sell the property if it was going to be anything like that on it.

"Q. And the discussion, I believe you said, you had brought in a restriction that had no time limit, and that was set aside—not set aside, but modified at his suggestion, and then there was a modification concerning the removal of gravel. At whose suggestion was that? A. Do you mean that part where it said, and if any gravel is removed?

"Q. Right now I am talking about the discussion had before the contract was signed. A. I am not sure I am clear.

"Q. I believe you stated that there was, that the original phrase as you had had it, was modified concerning the removal of gravel so that some gravel could be removed. A. Yes.

"Q. At whose suggestion was that? A. It was Mr. Scarbrough's.

"Q. Was there anything said by him definitely as to what gravel would be removed and for what purpose? A. Yes.

"Q. What was that? A. As I said awhile ago, it was going to be an amount that he would need for street or road purposes in that subdivision when he got ready to build a subdivision.

"Q. My point is, did he say that or was that in the conversation from you or Mr. Davis? A. That was in his conversation with Mr. Davis and with me.

"Q. That is, that was his explanation for wanting to change from the way you had it drawn? A. If there was any gravel, anyway, he would like permission to use enough for the streets and road of that subdivision, and that seemed reasonable enough to me, and and I said, all right.

"Q. So it was further modified? A. Yes, then came the ten year limit on the whole.

"Q. Were there further modifications agreed upon? A. No.

"Q. Then what happened? After you had had that much of a discussion, what happened? A. Then it was signed.

"The Court: What is that? A. It was signed. The contract was signed.

"Q. It was reduced to writing? A. Yes.

"Q. Yes. I am not trying to be too particular, but this is important. A. I reduced it to writing and it was read and looked at.

"Q. Who dictated that clause that was put in there? A. Mr. Wils Davis.

"Q. And that clause—was the contract typed up then and there? A. That's right.

"Q. State whether or not it was signed then and there. By both you and Mr. Scarbrough? A. That's right.

\* \* \* \* \* \*

"Q. Now this contract is dated January 14, 1953. Do you recall the date of the deed? A. No, I can't say that I do. It was in February, I think.

"Q. The deed was drawn then, approximately a month after—Would the third day of February be about correct? A. It could be, yes.

"Q. Mrs. Marron, at that time, between the time of the signing of this contract and the 3rd day of February, were you suffering from any physical disability? Were you under the care of a doctor? A. Yes, I was. I had been for quite a while.

"Q. Had you any plans for leaving the city? A. Yes, I had made an appointment to go to Mayo's for a physical examination.

"Q. Did you draw, or cause to be drawn, a deed to the property? A. Yes. I thought it might come up for closing while I was away, and I was trying to do what I could do before all that and draw up the deed.

"Q. Who drew the deed? A. I did.

"Q. What did you do with it? A. I gave to it Mr. Davis.

"Q. Why did you give it to him? A. Because as I just said, I thought the closing might come up before I returned.

"Q. Did you instruct him to go ahead and act as your agent in delivering the deed if it did? A. Yes.

"Q. Did the closing come up before you returned? A. No.

"Q. Do you remember when the closing was? A. I don't remember.

"The Court: Was the answer that it did come up before she returned?

"Mr. Davis: It did not.

"Q. Mrs. Marron, did you have any further conversation with Mr. Scarbrough concerning the transfer of this property between the time—that would be—January 14, 1953, the date of the execution of the contract to sell—and the date of the closing? A. I am sure I did not. If one of his cows got in my yard I might have called him to get it out or something like that, but certainly nothing to do with the transfer of the property. There was no reason.

"Q. You had no further conversation with him concerning the transfer of the property between those two periods of time? A. I am sure I did not.

"Q. Did anything occur that concerned the agreement concerning the transfer of the property? A. Yes. I left out—

"Q. I don't mean that. You said you hadn't talked to Mr. Scarbrough about it. Did anything

occur concerning it? A. No. I didn't know what you meant.

"Q. Were the agreements contained in the contract included in the deed? A. No. I inadvertently left them out.

"Q. Do you have any other explanation as to why the agreement was left out? A. No, except that I was just preoccupied with this visit to Mayo's and the illness that made it necessary for me to go, and that is all I could think of to make me leave out something. That actually was intended to go in the deed.

"Q. When you delivered this deed to Mr. Davis, did you go over it with him or just deliver it to him? A. I just gave it to him and asked him to handle it for me if I was not back.

"Q. You said that the closing was not held before you returned. Did you attend the closing of the transaction? A. I did."

Mr. Wils Davis testified for complainant. He and complainant, herself, are the only witnesses whose testimony throws any light on the controversy here involved. In addition, there is the testimony of the defendant, but, of course, he denied that he made any such oral agreement as is contended for by complainant. From the testimony of Mr. Davis, we quote:

"Q. Were you present in the negotitions that led up to the execution of that contract? A. I was.

"Q. How many acres of land were involved in that contract? A. Approximately nine and one-half acres.

"Q. You say it is located on the Raleigh-LaGrange Road? A. Well, her home is located on the Raleigh-LaGrange Road and about, I would say, approximately 600 feet back and adjoining and contiguous with her home property and originally a part of it is this 9½ acres.

"Q. Were you present, I believe you stated, during the negotiations between Mrs. Marron and Mr. Scarbrough? A. Yes, I was. The three of us were there in my office, at least part of the negotiations. All I know is it had come up before with Mrs. Marron; that is hearsay.

"Q. Is there any reference in that contract to gravel? A. Yes, sir.

"Q. Will you read it? A. The clause that is in the contract reads as follows: 'It is understood and agreed that this property is to be conveyed subject to the following restrictions: For a period of ten years no gravel plant shall be established upon said premises and in the event any gravel is removed from said premises then and in that event the holes and pits that are opened up for the purpose of taking gravel therefrom shall be filled and leveled so that the property can be used for residential purposes.'

"Q. What was the meaning of the phrase, gravel plant?

"Mr. Kirkland: Objection, if your Honor please.

"The Court: The objection will be sustained.

"Q. Do you know what a gravel plant is? A. I thought I did until this came up. I still think I do, yes.

"Q. Was any gravel plant located on that property after that contract? A. Yes, sir. According to my version of what a gravel plant is.

"Mr. Kirkland: We object to what his version is. If he wants to testify as to what a gravel plant is—

"The Court: If the witness can testify if he knows what a gravel plant is, and if he knows he may testify whether one is or is not on the property. A. Yes, sir, there is one on that property.

"Q. Was any gravel there thereafter removed after that contract was executed?' A. Yes.

\* \* \* \* \* \*

"Q. Well, now, Mr. Davis, were you advising Mrs. Marron with respect to the execution of this contract and the deed that followed? A. Well, Mr. Scarbrough—may I tell it just like it happened?

"Q. That is the only way I want it told. A. Mr. Scarbrough came into my office, Mrs. Marron brought him back into my office—I practice law with my two sons—and Mrs. Marron stayed out front, has her desk out in the reception room—Mr. Scarbrough came back into my office. We sat there. I was told about the offer of purchase then, and they wanted to prepare a contract. It was discussed quite at length about the whole thing. Finally, after the full discussion of it, I thought I had the meeting of the minds of the two parties. I dictated this contract.

"Q. What occurred at the time and what was said at the time, either by Mrs. Marron or Mr. Scarbrough or both of them, there in your presence while you were discussing this contract?

"Mr. Kirkland: Objection if your Honor please. This contract has been reduced to writing. We don't believe that any parole evidence is admissible to vary, change or contradict the terms of the contract. It speaks for itself.

"The Court: He may state, in the opinion of the Court, what took place.

"Mr. Kirkland: Exception. A. Well, Mrs. Marron called attention to the fact that south of this—east of this place there had been a gravel operation some distance, some, oh, half mile or maybe a quarter mile, a little further on down that road, and that she wouldn't sell her land at any price if there is to be any gravel operation out there on it. Mr. Scarbrough stated that, when that was discussed, that he was buying this property for subdivision only, residential purposes. And then the question of whether or not there would be a clause in the contract that would restrict the gravel operation of that came up. In the discussion there Mrs. Marron prepared—I think—I know she prepared—she has a habit of getting an idea about a thing and then writing it out on the typewriter, and bringing it back, and we mulled over it and go over it. She prepared a statement to the effect that no gravel operations be carried on of any kind or character there, and that would be permanent. At any time that would be the restriction on the deed. Mr. Scarbrough then asked that he might not be able—he might not keep it two or three years and might not be able to decide that he might not want to—might want to sell it, and then the restriction clause of that character, a permanent

restriction clause, would prohibit him from selling that land, and then it was that he said if we could restrict it for ten years it would be all right. And then it was that we begun—Mrs. Marron made the remark, I don't care what happens after ten years. Then we begun to try to work out something on that plane of thought. And we wrote this phrase in this contract.

"Q. Well, was there any request made by Mr. Scarbrough or any statement about removing gravel, and, if so, for what purpose? A. He said this: He raised the question about taking gravel out of there. He said, now, I might want to take out some gravel there if it goes into subdivision purposes and to build the gutters and curbs with. I said, well— or Mrs. Marron said—Well, there won't be any objection to that if they fill the holes. I thought, probably, there was some gravel right near the top that they wanted to use for that purpose. I knew they couldn't take it deep because then we would have a proposition of settling over a period of years, whether he could build a house on it or not.

"Q. This reference here to a gravel plant, what is a gravel plant, if you know? A. A gravel plant, Mr. Gwinn, is any gravel operation, in my opinion, my version of it, and it was the sense, I thought, of all the parties there at that time, at least Mr. Scarbrough knew that was our thought about it—

"Mr. Kirkland: We object to him testifying to the thought of the parties at the time.

"The Court: The objection will be sustained. A. I beg your pardon.

"The Court: The other witnesses will be allowed to testify what a gravel plant is, if they have knowledge of it. But so far as what was in the minds of the parties, the Court feels we cannot explore that part.

"Q. Mr. Davis, did you—

"The Court: Excuse me. A conversation, under the ruling of the Court that occurred in the office may be detailed.

"Q. Mr. Davis, did either you or Mrs. Marron there in the office, in the presence of Mr. Scarbrough, express your opinion or state what you considered a gravel plant to be? A. Maybe not in just those words, but certainly what was said and done there it carried that meaning and sense.

"Mr. Kirkland: If your Honor please, we object to that. It is calling for a conclusion, that they came to any conclusion or sense. He may recite the words.

"The Court: Mr. Davis, you may state what was said. A. Mrs. Marron said she wouldn't sell that property at any price if there was going to be a gravel operation carried on back there of any kind, and that was thoroughly understood.

"Mr. Kirkland: If your Honor please, we object to him saying it was thoroughly understood. A. Thoroughly stated, I will say. And then I asked Mr. Scarbrough myself, what he wanted with that property. And he said, he wanted it for residential purposes. That it was his purpose some time to open it up for a subdivision residential purpose, and it was on that theory that I dictated this contract.

When Mrs. Marron prepared this statement, as I said awhile ago, the little squabble that carried the forbidding of operation of gravel of any character there, he then brought up the proposition of having it, a permanent restriction clause, in the contract. He said it might come to where he would decide not to open it, and he wouldn't want it restricted and that is what brought in the ten year proposition.

\* \* \* \* \* \* \*

"Q. Now, Mr. Davis, a deed was later drawn after that contract was executed, was it not? A. Yes, sir.

"Q. Did you draw that deed? A. No, I did not.

"Q. Do you know who did? A. No, I don't, except Mrs. Marron handed it to me. She was going to Mayo's and the question was whether there would be a closing before she got back, and she just handed it to me and said, if there was, to deliver it for her and collect the money. It was a cash deal. I don't know who prepared it. I didn't.

"Q. Well, in the execution of that deed or the closing of that deed, insofar as you advised Mrs. Marron, was there any intention or purpose of changing the contract? A. Oh, no."

Aside from the question of whether or not the evidence quoted above and other evidence offered in this cause was clear, cogent and convincing, which, in our opinion, it was not, we think that all testimony with reference to any alleged oral agreement between the parties prior to or contemporaneous with the execution

of the written contract of sale on January 14, 1953, was incompetent under the parol evidence rule and should have been excluded by the Chancellor. With that testimony excluded, complainant did not make out even the semblance of a case. For reasons hereinafter stated, we think the complainant was entitled to establish the terms of the written contract of sale, and to have the restriction contained in that contract incorporated into the deed. That would amplify and explain, without varying the terms of the deed, and especially so with reference to the consideration for the conveyance. The test as to application of the parol evidence rule is whether the testimony as to oral agreements or negotiations varies or contradicts the instrument in question or merely explains same. The law is well settled that all evidence of verbal negotiations and stipulations anterior to or contemporaneous with the execution of a written instrument which contradict, alter or vary the terms of the written instrument is barred by the parol evidence rule, which is a rule of substantive law in Tennessee. McGannon v. Farrell, 141 Tenn. 631, 214 S. W. 432; Litterer v. Wright, 151 Tenn. 210, 268 S. W. 624; McQuiddy Printing Co. v. Hirsig, 23 Tenn. App. 434, 134 S. W. (2d) 197.

In McGannon v. Farrell, supra [141 Tenn. 631, 214 S. W. 433], it was shown by testimony introduced in the lower court, over the objection of the defendant, that, as part of the contract of sale of the property there involved, the defendant orally agreed to erect upon the lot conveyed by the deed a handsome residence for himself, adjoining property of the plaintiff. In reversing the Circuit Court and the Court of Civil Appeals, the Supreme Court, speaking through Mr. Justice Hall, said:

"We are of the opinion, after a careful examination of the record, petition, and assignments of error of the defendant, that said suit should have been dismissed by the Court of Civil Appeals. If it be conceded that the alleged parol agreement with respect to the building of said residence by the defendant was sufficiently definite to constitute a valid binding agreement, which question, however, need not be passed upon, still we are of the opinion that said agreement could not be established by parole proof, because it is in direct contravention of the terms of the deed, which conveyed to defendant an absolute unrestricted title to said property. The effect of the parol agreement, if permitted to be shown, would be to engraft upon the defendant's title a restriction or incumbrance, which is not only not expressed in the deed but is repugnant to its terms."

In Litterer v. Wright, supra [151 Tenn. 210, 268 S. W. 624], the Supreme Court had before it an appeal from a decree on a rent note, in which it was insisted that the Chancellor who tried the case in the lower court had erred in refusing to submit to the jury which had tried the case, issues concerning an alleged parole agreement, made prior to the signing of the lease and the rental note sued on, by which the lessor bound himself to repair or renew a roof on the rented building, and that such repairs had not been made. In affirming the decree of the Chancery Court, the Supreme Court, speaking through Mr. Justice Chambliss, said:

"Evidence that the lessor had agreed to make necessary repairs on the premises is directly contradictory of the terms of the writing and clearly

inadmissible. Parol proof of inducing representattions to the making of a contract reduced to writing must be limited to matters not otherwise plainly expressed in the writing. No well-considered case will be found holding otherwise. The fundamental distinction should be kept clearly in mind between the denied right to contradict the terms of the writing, and the recognized right without so doing to resist recovery thereon, or to rely upon matters unexpressed therein. The ultimate test is that of contradiction, which is never permissible.''

Closely allied to the parol evidence rule, although not necessarily a part of same, but equally applicable to the facts of the instance case, is the rule that prior agreements, whether oral or written, are merged into the written contract as finally executed. Williston on Contracts, Volume II, page 1379-1380, Sec. 723; pages 1763-1764, Sec. 926; Volume III, page 3145, Sec. 1826; American Fruit Growers, Inc., v. Hawkinson, 21 Tenn. App. 127, 106 S. W. (2d) 564, 565. This rule of law, in our opinion, precludes the complainant in the instant case from relying on any alleged oral agreement made prior to the execution of the written contract of sale on January 14, 1953.

Complainant's right to reform the deed dated February 3, 1953, recorded in Record Book 3069, page 333, Register's Office of Shelby County, Tennessee, and incorporate into same the restrictive provision contained in the contract of sale executed January 14, 1953, stands on a different footing. In our opinion, this deed should be reformed so as to incorporate into it the restrictive provision as set out in said contract of January 14,

1953. We reach this conclusion on the authority of Fuller v. McCallum & Robinson, Inc., 22 Tenn. App. 143, 118 S. W. (2d) 1028, 1037. In that case, Mrs. Ada Norfleet Fuller brought suit against McCallum & Robinson, Inc. and George P. Phillips and wife, seeking recovery of a deficit after foreclosure of a mortgage on real estate. Phillips and wife had executed the mortgage securing part of the purchase price of the land conveyed to them, which land they later contracted tò sell to McCallum & Robinson, Inc. The contract of sale provided that McCallum & Robinson, Inc. would assume the mortgage indebtedness as part of the consideration for conveyance of the land. After the signing of this contract, but before the execution and delivery of the deed, McCallum & Robinson, Inc. assigned a one-half interest, under the terms of the contract, to one E. G. Willingham. Willingham objected to a provision in the deed of conveyance which provided that the grantees assume the mortgage indebtedness, and the deed was redrafted so as to provide that the conveyance was being made subject to the mortgage. Willingham was brought into the case by a cross bill filed by Phillips and wife against him and McCallum & Robinson, Inc. The author of this opinion, who was at that time Chancellor in Shelby County, applied the rule that the contract of sale was merged into the deed, and dismissed both the cross bill and the original bill, so far as they asserted liability against McCallum & Robinson, Inc. and E. G. Willingham. On appeal, however, this decree was reversed as to McCallum & Robinson, Inc., and it was held primarily liable for the deficit, under the principle that when it contracted to pay the mortgage debt, it became primarily liable and Phillips became only a surety. In arriving at this result, the

opinion of the Court of Appeals, written by Senter, J., bases its conclusion on its holding that permitting the terms of the contract of sale to be proved and enforced against McCallum & Robinson, Inc., did not contradict or vary the terms of the deed in question, but merely explained and enforced the consideration which McCallum & Robinson, Inc. had contracted to pay for the property. This was not a violation of the parol evidence rule. From the opinion of the Court of Appeals, we quote, as follows:

"Appellee relies upon the rule that where an executory contract has been entered into between the parties for the sale and purchase of real estate, and subsequently the property is conveyed by a deed to the purchaser named in the contract, that the contract of sale being merely an executory contract, merges into the deed and controls. This is the generally recognized rule. Page on Contracts, Sec. 2567; Watson-Loy Coal Co. v. Monroe Coal Mining Co., 85 W. Va. 645, 102 S. E. 485; Restatement of the Law of Contracts, Vol. 2, Sec. 416; Williston and Thompson on Contracts, Sec. 723; City of Bend v. Title & Trust Co., 134 Or. 119, 289 P. 1044, 84 A. L. R. 1001.

"This, we understand to be the general rule, but it has its exceptions.

"Where there has been a contract for the sale of real estate at a designated sum, and included in the total amount of the consideration recited in the contract of sale is a mortgage indebtedness against the property, and this mortgage debt is specifically assumed in the contract of sale, and the deed executed pursuant thereto, does not purport to set out the

true consideration, but recites the consideration as a stated nominal sum and other valuable considerations, it is always permissible to prove the actual consideration to be paid by the vendee to the vendor.''

In the instant case, the consideration recited in the deed is: ''Ten ($10) Dollars cash in hand paid, and other good and valuable considerations, the receipt of which is hereby acknowledged.'' The actual consideration, as recited in the contract of sale dated January 14, 1953, was ''Five Thousand ($5,000) And No One Hundred Dollars upon the following terms: Cash'', followed, however, by the restrictive covenant which had been dictated by Mr. Wils Davis and which has been quoted above. It seems clear to us, therefore, that incident to showing the true consideration, which was not fully recited in the deed, it was eminently proper for the complainant to prove and have incorporated into the deed, by way of reformation of same, the restrictive provisions of the contract of sale. In our opinion, however, that is the extreme limit of any right which complainant is entitled to assert and maintain in this cause.

With the restrictive covenant thus limited, even when same is by reformation incorporated into the deed, it is not sufficiently shown on the record of this cause that there has been a breach of such covenant. Defendant has contracted for the filling and leveling of the gravel pits, and there is no reason to presume that when that contract is completed, defendant will have failed to comply with the terms of the restrictive covenant. In order to take care of the possibility, however, that the completion of said contract may not constitute adequate com-

pliance by defendant with the terms of the restrictive covenant, the decree to be entered in this Court may expressly provide that it is without prejudice to the rights of complainant to further litigate that question. The $2,800 awarded as damages by the decree of the lower court was obviously based upon the finding of fact contained in issue number I, which in our opinion, was erroneously submitted to the jury, and therefore, such allowance of damages must be disallowed. The finding of fact made by the jury on issue number II was expressly approved by the learned Chancellor, acting in the capacity of a thirteenth juror.

The issue of whether or not the restrictive covenant contained in the contract of sale dated January 14, 1953 was omitted from the deed as the result of mutual mistake, or because of fraud, is one which we never reach. In view of the case which we have taken, as hereinabove set out, the restriction contained in the contract of January 14, 1953, is, without violating the parol evidence rule, to be incorporated in the deed, not because it was omitted therefrom as a result of fraud or mistake, but because it amplifies and explains the nominal consideration recited in the deed. The alleged oral agreement which complainant seeks to have incorporated into the deed, and in which effort she was successful in the lower court, must be eliminated, because it violates the parol evidence rule, and, also, because it was superseded by the written contract of January 14, 1953, which is to be incorporated into the deed. In any event, there was absolutely no evidence from which the jury could have found fraud, or that it was omitted because of a mutual mistake. The complainant, herself, testified that it was because of inadvertence on her part that she omitted copying into the deed the

restrictive covenant contained in the contract, and Mr. Davis testified that no change in the wording of the written contract was contemplated between the date of its execution and the date of execution and delivery of the deed.

Our conclusions are fortified by the rule of interpretation that language used in a contract will be construed most strongly against the party who has used it. Williston on Contracts, Volume 2, pages 1203-1204, Section 621. Certainly, the language used in the contract of January 14, 1953, must be considered complainant's language. It was accepted and typed by her from the dictation of her employer and legal advisor, Mr. Wils Davis, a prominent member of the Memphis Bar.

We deem it unnecessary to remand this cause for further hearing in the lower court. Although the cause was tried before a jury, and that procedure is ordinarily required where an appellate court reverses the cause on an appeal in the nature of a writ of error (Gibson's Suits in Chancery, 5th Ed., Sec. 1334), nevertheless, Footnote 76 in said section of Gibson, says: "If the trial by jury is for the information of the court, and not on demand of either party, the rule would probably be different." We so rule in the instant case. Here, the jury was not demanded by either of the parties, but was impanelled by the learned Chancellor on his own motion, and the verdict of the jury was, therefore, merely advisory.

It results that the decree of the Chancery Court must be reversed. A decree may be entered here reforming the deed dated February 3, 1953, recorded in Record Book 3069, page 333, Register's Office of Shelby County, Ten-

nessee, by incorporating in same the restrictive covenant as set out in the written contract of sale dated January 14, 1953. In all other respects, complainant's bill in this cause will be dismissed. The decree may provide that it is without prejudice, with reference to future litigation, if complainant claims a breach of the restrictive covenant so incorporated in said deed.

The costs of this cause, including the costs of the lower court, as well as those of the appeal, are adjudged against the complainant, Mrs. Naytine J. Marron, and the sureties on her cost bond filed in the lower court.

Avery, P. J. (Western Section) and Carney, J., concur.