FIRST STATE BANK OF WAYNE COUNTY, KENTUCKY (Formerly City and County Bank of Wayne County), Plaintiff–Appellant,

v.

The CITY AND COUNTY BANK OF KNOX COUNTY, TENNESSEE, Defendant–Appellee.

No. 88–5583.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 9, 1989.

Decided April 6, 1989.

Margaret E.M. Keane, James E. Milliman (argued), Greenebaum, Doll & McDonald, Louisville, Ky., for City and County Bank of Wayne County.

Margaret E.M. Keane, James E. Milliman, Louisville, Ky., for Federal Deposit Ins. Corp., in its capacity as Receiver for City and County Bank of Knox County.

Ronald D. Bowling, J.M. Trimble, Kevin G. Henry (argued), Trimble & Henry, Lexington, Ky., for First State Bank of Wayne County, Ky., fka The City and County Bank of Wayne County.

Before MILBURN and BOGGS, Circuit Judges, and CONTIE, Senior Circuit Judge.

MILBURN, Circuit Judge.

Plaintiff-appellant First State Bank of Wayne County, Kentucky ("First State") appeals from the final judgment of the district court and a subsequent denial of its motion for a new trial in this action on an oral contract wherein the now defunct City & County Bank of Knox County, Tennessee ("C & C Knox") allegedly agreed to repurchase certain loans or loan participations at any time upon demand. First State seeks specific performance or damages from the Federal Deposit Insurance Corporation ("FDIC") in its capacity as receiver for C & C Knox. The principal issues on appeal are

(1) whether the district court erred in holding that the oral agreement was unenforceable under the Tennessee parol evidence rule; and (2) whether the district court erred in further holding that the oral agreement was contrary to public policy and therefore unenforceable. For the reasons that follow, we affirm.

### I.

#### A. *Procedural History*

On May 27, 1983, First State filed this action seeking to compel C & C Knox to repurchase certain loans and loan participations and named numerous other defendants, including the FDIC in its corporate capacity. C & C Knox was closed later that same day, and the FDIC was appointed as its receiver.[1] On September 9, 1983, the FDIC, in its capacity as receiver for C & C Knox, was substituted as a defendant for C & C Knox.

First State's breach of contract claim against C & C Knox and the FDIC in its corporate capacity was severed from First State's other claims prior to trial. First State's claim for damages was also bifurcated, and a bench trial was held solely on the issue of liability of the FDIC as receiver with respect to the alleged oral agreement to repurchase the loan participations. Trial commenced on September 18, 1984, and continued through September 21, 1984.

On September 28, 1987, while the case was still under submission, First State filed a motion pursuant to Rule 59 of the Federal Rules of Civil Procedure to reopen the proof for the limited purpose of taking the testimony of C.H. Butcher, Jr. ("Butcher"), and attached Butcher's affidavit setting forth his proposed testimony confirming the oral contract. Butcher had invoked his Fifth Amendment privilege against self-incrimination during the trial, but after having pleaded guilty to several federal offenses, Butcher stated that he was prepared to testify that he had entered into an agreement to repurchase on demand with First State before C & C Knox sold any loan participations to it. The district court denied the motion, however, on the grounds that the proffered testimony was merely cumulative of testimony heard at trial.

On January 8, 1988, the district court entered a Memorandum Opinion containing findings of fact and conclusions of law, dismissing First State's claims on the ground that any oral agreement to repurchase the loan participations was unenforceable. The district court concluded (1) that the oral contract for repurchase was barred by the Tennessee parol evidence rule since the participations were evidenced by written certificates, and (2) that the oral contract for repurchase was unenforceable because it was the type of secret side agreement which offends federal public policy designed to protect the FDIC when it purchases the assets of failed banks.

The district court delayed entry of judgment, however, because First State had numerous other unresolved claims outstanding, and instructed First State to apprise the court of the status of those claims. Prior to the entry of judgment, First State filed motions to amend the judgment and for a new trial.[2] On January 28, 1988, noting First State's failure to apprise the court of any outstanding unresolved claims, the district court entered a final judgment dismissing First State's claims against C & C Knox, the FDIC in its receiver capacity, and the FDIC in its corporate capacity. First State's motions were denied on April 20, 1988, and First State filed a notice of appeal on May 19, 1988.

#### B. *Factual Background*

In November 1981, Millard Oakley, an attorney and former Commissioner of In-

---

**1.** As we have previously noted, "[t]he FDIC's roles as receiver and as a corporate insurer are distinct. In its capacity as receiver, the FDIC is obligated to marshal the assets of the failed bank for the benefit of the bank's creditors and shareholders. In its corporate capacity, the FDIC is obligated to insure the failed bank's deposits." *FDIC v. Hatmaker*, 756 F.2d 34, 36 n. 2 (6th Cir.1985).

**2.** The ten-day time limit after the entry of judgment contained in Fed.R.Civ.P. 59(b) "sets a maximum and there is nothing to prevent making a motion for a new trial before judgment has been entered." 11 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2812, at 82 (1973) (footnote omitted).

surance for the State of Tennessee, approached his long-time friend and associate, Butcher, then Chairman of the Board of C & C Knox, concerning the possibility of obtaining financing to purchase First State, which is located in Monticello, Kentucky. Butcher suggested that Oakley contact Butcher's friend, Phillip Hayes, a banker who was also interested in purchasing First State, and Oakley and Hayes eventually formed a bank holding company, Wayne Bancshares, and purchased First State on May 17, 1982.

The next day, Oakley met with Butcher and Emmett Foster, then President of C & C Knox, to discuss the future profitability of First State and the need to have additional loans with high rates of interest. Butcher and Foster advised Oakley that they planned to form a bank consulting company, later incorporated on June 16, 1982, under the name of C & C Interstate Financial Corporation, which would offer a wide range of services to small rural banks. Oakley testified that both Butcher and Foster advised him that C & C Knox could provide First State with high-yielding loans and loan participations which would improve First State's profitability. It was also suggested that Foster serve as Chairman of the Board of First State in order to lend his experience and expertise in helping to increase First State's profitability. The next day, May 19, 1982, Oakley and Foster were elected to First State's Board of Directors.

Although the Board of Directors had not adopted a resolution allowing First State to purchase loan participations from C & C Knox, Oakley met with Butcher and Foster in Knoxville, Tennessee, on May 27, 1982. At this meeting, Butcher and Foster, on behalf of C & C Knox, offered to sell loans and loan participations to First State. Even though he had not been authorized to make such an agreement, Oakley agreed to purchase loans and loan participations. Butcher orally agreed that C & C Knox would repurchase the loans or loan participations at any time, for any reason, on demand by First State. The district court found that this was a general policy C & C Knox had with all of its affiliated banks.

Pursuant to the agreement, the loans were supposed to have been for a short duration and for not more than a few hundred thousand dollars. This agreement was never put into writing, and Oakley testified that this oral agreement is the sole agreement First State relies on in this action.

On June 22, 1982, Foster was elected Chief Executive Officer of First State and was granted authority to make loans in the full lending limits of $200,000 unsecured and $300,000 secured. On that same day, Foster brought with him six loan participations totaling $1.8 million. He reiterated his agreement with C & C Knox that they would repurchase the loans, if requested. However, the Board of Directors never memorialized the oral agreement in writing. Although no resolution was passed by First State authorizing the purchase of the participations brought in by Foster, First State purchased them on June 25, 1982, without any written agreement requiring C & C Knox to repurchase them.

Thereafter, and continuing through January 5, 1983, loan participations were purchased by First State from C & C Knox in the aggregate sum of $7,384,574.00. During the same time First State received $1,342,995.00 which was credited to its account at C & C Knox as payment of principal, not interest on these loan participations. Each loan participation certificate issued by C & C Knox and accepted by First State contained the following language:

> We [C & C Knox] will exercise the same care and diligence in making, handling, and collecting this loan as if it were solely for our account and no further responsibility or liability is assumed or implied ... [W]e reserve the right, at any time, to repurchase all or any part of this participation at par plus accrued interest, or at par less unearned discount, whichever shall apply.

*The record shows that all of the loan participation certificates were accepted by First State without protest of the limited responsibility assumed by C & C Knox in the certificates.* Moreover, First State never requested nor insisted that C &

C Knox modify the language that arguably indicated that C & C Knox had no obligation to repurchase the participations.

The only resolution by the Board of Directors of First State authorizing the purchase of the participations was adopted on November 11, 1982, five months after the first $1.8 million in participations had been placed with First State. The Board acknowledged in the minutes of the meeting that it had assumed the entire risk of the loans purchased and indicated that the loans were nonrecourse as to C & C Knox:

> Since loan participations are nonrecourse unless otherwise stated by the lead bank, this bank is buying a pro-rata share of the credit risk in the collateral value....

During a routine examination of First State on August 23, 1982, an FDIC examiner discovered that two of the participations purchased from C & C Knox involved a common borrower, and when lumped together, constituted an "overline" which was in excess of the legal lending limit of the bank to one person under Ky.Rev.Stat. Ann. § 287.280 (Michie/Bobbs–Merrill 1981). When informed of the overline, the President of First State called C & C Knox and requested that one of the loan participations be repurchased. C & C Knox immediately repurchased the loan in accordance with the prior oral agreement.

As part of the August 1982, examination, First State prepared an Officer's Questionnaire, sworn to and signed by the President of the Bank, which was provided to both the FDIC and the Kentucky Department of Banking. Question 2 of that questionnaire required First State to list each loan or debt for which it alone had responsibility and for which no other bank was obligated to repurchase. First State answered that each of the participations purchased from C & C Knox was First State's sole responsibility.

An Officer's Questionnaire answered by C & C Knox pursuant to a November 2, 1982, examination report requested a list of loans sold without an obligation on its part to repurchase. Foster, acting on behalf of C & C Knox, listed the participations sold to First State as being without recourse as of the date of the examination. C & C Knox was also required to list those participations which it had agreed to or had an obligation to repurchase. Consistent with First State's records, C & C Knox did not list any of the loan participations sold to First State as being sold pursuant to an agreement, written or oral, to repurchase. C & C Knox was also required to list liabilities or obligations which it had guaranteed which were not listed elsewhere. In response to this question, C & C Knox again indicated that none of the loans at issue in this appeal were guaranteed by C & C Knox for the benefit of First State.

At the time of the examinations of both First State and C & C Knox, the banks had a manual furnished by the FDIC for the preparation of consolidated reports of income for examinations. The instructions informed both banks that loan participations merited special attention, providing them with the following directions:

> Participated loan—a loan made in cooperation with other financial institutions in which the lead institution organizes the loan and each participant has a pro-rata share in the return and the risk. Each institution's share of this loan should be classified in Schedule A using the same procedure as used to classify other loans.... In some cases, where it is specifically stated in the underlying agreement that the lead institution is retaining the risk, the entire loan should remain on the books of the lead institution and the participation proceeds reported as borrowings in Liability Item 26(b), "Other liabilities for borrowed money." Other institutions participating in the loan should classify their part of the loan in Schedule A as a loan to the lead institution.

The loan participations at issue in this appeal were not listed as loans to other financial institutions on the examination reports filed with the FDIC by First State even though such reporting would have been beneficial to First State.

In late 1982, Oakley became dissatisfied with First State and approached Butcher to help him find a purchaser for Oakley's

interest. Butcher informed Oakley that Alton Blakley, a business associate of Butcher and a member of the Board of Directors of First State, would purchase Oakley's interest. However, Blakley became ill with cancer and never purchased the shares.

On January 7, 1983, concerned about the financial condition of banks affiliated with both C.H. Butcher, Jr., and his brother, Jake Butcher, FDIC officials met with the Butchers and secured an agreement from them that banks in which they had an interest would not undertake certain financial transactions, and C & C Knox would not repurchase any loan participations unless C & C Knox had a binding, written obligation to do so. The purpose of this agreement was to freeze participation in loans in order that an accurate examination of Butcher banks could be performed.

On January 6 or 7, 1983, while the Butchers were in Memphis meeting with the FDIC, Oakley went to Knoxville and talked with Foster concerning the repurchase of all the loans and participations. Oakley testified that he thought it would be easier to sell First State without the out-of-area loans and with as much cash in it as possible. Foster informed Oakley that he would have to talk with Butcher about the matter, but that he did not foresee any problems. Foster was apparently unaware of the agreement that the Butchers were entering into with the FDIC in Memphis at that time. When Butcher returned to Knoxville, both he and Foster informed Oakley that C & C Knox would repurchase the loan participations, but that permission from the FDIC was necessary for such repurchase.

On January 20, 1983, the FDIC issued a Temporary Cease & Desist Order which was served upon C & C Knox prohibiting it from repurchasing loans and loan participations unless there was a "legally binding obligation" to do so. A subsequent permanent cease and desist order was entered incorporating the terms of the temporary order.

On January 31, 1983, the FDIC and the Kentucky Department of Banking commenced an examination of First State as part of a coordinated examination of all Butcher banks. As part of the examination, another Officer's Questionnaire was signed by the President of First State which informed the FDIC that the participations purchased by First State from C & C Knox were nonrecourse and that there was no obligation on C & C Knox to repurchase. Moreover, although the participations at issue in this appeal were the object of much scrutiny by the FDIC examiners, the examiners testified that First State at no time informed them of any oral agreement between C & C Knox and First State requiring C & C Knox to repurchase the participations.

On March 2, 1983, there was a meeting between the Board of Directors of First State and representatives of the FDIC and the Kentucky Department of Banking. At this meeting, the Directors of First State first became aware of the poor quality of the loans and loan participations which First State had been receiving from C & C Knox. Based upon information that C & C Knox had not made available to First State, FDIC examiners adversely classified over $4 million of the participations and loans which came from C & C Knox. Oakley informed the regulators that he had an agreement with Butcher and Foster that C & C Knox would repurchase the participations, and sought the permission of the FDIC for C & C Knox's repurchase of the participations. The FDIC informed First State that permission would not be granted absent a written agreement, unless there was evidence of fraud.

The Directors of First State were also informed that they might be personally liable on the loan participations if they were uncollectible, and the Directors were cited for certain failures on their part. *See First State Bank v. FDIC*, 770 F.2d 81 (6th Cir.1985) (outlining the unsafe or unsound banking practices and subsequent FDIC administrative action). As a result of the meeting on March 2, 1983, the Board of Directors of First State voted to request that C & C Knox repurchase the loan participations made on behalf of it by C & C Knox, amounting to more than $5 million at

the time. On March 3, 1983, First State made written demand upon C & C Knox for repurchase of the participations.

When there was no response to the written demand, Oakley went to Knoxville and met with Gardner Daniel, Executive Vice-President of C & C Knox, in an attempt to convince Daniel to repurchase the participations. Daniel responded that it was C & C Knox's position that the loans and loan participations were nonrecourse. Oakley then threatened to sue C & C Knox, claiming that Foster had engaged in fraudulent activities, and insisted that unless the participations were repurchased, First State's holding company would default on a $2.1 million loan owed to C & C Knox. Daniel then agreed to present Oakley's demand to C & C Knox's Board of Directors.

In subsequent conversations with Daniel on March 18 and 28, 1983, Oakley again threatened to default on the holding company's note. On April 11, 1983, C & C Knox's Board of Directors, noting Oakley's threat of litigation and potential default, adopted a resolution requesting the FDIC's permission to repurchase the participations. Daniel testified, however, that C & C Knox refused to commit unequivocally to repurchase, but instead reserved the right not to repurchase, even if the FDIC gave its approval to do so. Daniel opined at the time that "should the matter reach litigation, we are concerned that our position is somewhat weak."

As earlier stated, this action was filed on May 27, 1983. Later that day, C & C Knox was declared insolvent and closed by the Tennessee Department of Banking, and the FDIC was appointed receiver. The FDIC then entered into a "Purchase and Assumption" transaction under 12 U.S.C. § 1823 (1982 and Supp.1988) with the Bank of Knoxville and the FDIC in its corporate capacity, resulting in the transfer of all deposits and cash to the assuming bank along with the deposit liabilities and the transfer of all other assets to the FDIC in its corporate capacity. *See Gunter v. Hutcheson*, 674 F.2d 862, 865–66 (11th Cir.) (description of purchase and assumption transactions), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982).

## II.

### A. *Parol Evidence Rule*

■ The district court concluded that "although the parties here had an oral understanding, it was never reduced to writing. Instead, the participation certificates represent the only agreement in writing and they do not mention any requirements to repurchase." J.A. at Vol. I, p. 181. The district court then concluded that the parol evidence rule excluded any evidence of the agreements.[3]

In Tennessee, "[t]he law is well settled that all evidence of verbal negotiations and stipulations anterior to or contemporaneous with the execution of a written instrument which contradict, alter or vary the terms of the written instrument is barred by the parol evidence rule, which is a rule of substantive law in Tennessee." *Marron v. Scarbrough*, 44 Tenn.App. 414, 451, 314 S.W.2d 165, 181 (1958).[4] Moreover, any prior agreements merge into the final written agreement. "Closely allied to the parol evidence rule, although not necessarily a part of same, ... is the rule that prior agreements, whether oral or written, are

---

3. The parties do not dispute the district court's conclusion that Tennessee law governs this issue.

4. While not at issue in this appeal, it appears that Tennessee law is in conflict on whether a party must object in the trial court to evidence thought to be violative of the parol evidence rule in order to preserve appellate review. In *Tri–Cities Forklift Co. v. Conasauga River Lumber Co.*, 700 S.W.2d 548, 549 (Tenn.Ct.App.1985), the court held that since "the parol evidence rule is not merely a rule of evidence but a rule of substantive law, we are bound by it on appeal whether the appellant objected on the trial of the case or fails to raise it as an issue on appeal." *Accord Maddox v. Webb Constr. Co.*, 562 S.W.2d 198, 201 (Tenn.1978); *Lazarov v. Klyce*, 195 Tenn. 27, 255 S.W.2d 11 (1953). However, in *Rhea v. Marko Constr. Co.*, 652 S.W.2d 332, 334 (Tenn.1983), the Tennessee Supreme Court held, without citing or referring to any of its previous holdings to the contrary, that failure to object at trial to evidence alleged to be violative of the parol evidence rule precluded appellate review.

merged into the written contract as finally executed." *Id.* at 453, 314 S.W.2d at 182. *See also Strickland v. City of Lawrenceburg,* 611 S.W.2d 832 (Tenn.Ct.App.1980).

Initially, First State argues that the verbal understanding it reached with C & C Knox did not vary, alter or contradict the terms of the loan participation agreements, nor was it in any way inconsistent with them. The FDIC relies on the language of the participation certificates which limits the responsibility of C & C Knox:

> We [C & C Knox] will exercise the same care and diligence in making, handling and collecting this loan as if it were solely for our account, and no further responsibility of liability is assumed or implied....

The FDIC argues that the above language unambiguously establishes that C & C Knox had no further responsibility or liability on the loans in question, and thus no responsibility to repurchase the loans on demand. *See Percy Galbreath & Son, Inc. v. Dehyco Co.,* 548 S.W.2d 664, 666 (Tenn. Ct.App.1976) ("In the absence of fraud or mistake ... a contract must be enforced as it is written, even though containing terms which may be thought harsh and unjust."). However, First State argues that the above language refers only to C & C Knox's responsibility in the "making, handling, and collecting" of the loans, and does not limit or bar the enforcement of an oral contract to repurchase.

In our view, there is some ambiguity in the language, and, therefore, the oral agreement is not clearly inconsistent nor in conflict with the loan participation certificates. The participation certificates are without any type of merger clause, and it is reasonable to assume that the second clause of the sentence in question is related solely to the duties enunciated in the first clause of the sentence, and is not related to some unmentioned or undisclosed duty or obligation. Accordingly, because there is an ambiguity in the written contract, the oral agreement between C & C Knox and First State is not inconsistent with the loan participation certificates, and therefore not barred as an inconsistent agreement by the parol evidence rule.

"[W]here there exists an ambiguity in a contract, parol evidence is admissible to explain the actual agreement." *Jones v. Brooks,* 696 S.W.2d 885, 886 (Tenn.1985); *see also Wilkerson v. Williams,* 667 S.W.2d 72, 76 (Tenn.Ct.App.1983) ("Although a contract cannot be varied by oral evidence, the course of previous dealings, the circumstances in which the contract was made, and the situation of the parties are matters properly to be looked to by the court in arriving at the intention of the parties to the contract."). However, C & C Knox is not seeking to admit the testimony to explain and enforce the ambiguous language in the certificates. Rather, it is seeking to enforce something not mentioned in the writing. Thus, the ambiguity of the phrase in question is relevant only in that it cannot be used to establish an inconsistency with the parol agreement.

As noted above, C & C Knox specifically reserved the right to repurchase the participations at any time at par plus accrued interest. The FDIC argues that since C & C Knox specifically reserved this right in writing, it would be inconsistent for the oral agreement in question to be otherwise than in writing. However, the fact that one right is established in a writing does not necessarily preclude all other rights. Even where an agreement is determined to be partially integrated, parol evidence is admissible to supplement the writing with consistent additional terms. *Early v. Street,* 192 Tenn. 463, 472, 241 S.W.2d 531, 535 (1951). If one party has the right to rescind the contract on demand, then it is not inconsistent for the other party to have a similar right or remedy.

Once it is determined that the parol agreement is not inconsistent with the writing, it must then be determined whether or not the written agreement constituted an integrated writing. As recently stated by the Tennessee Court of Appeals, "[p]arol evidence is admissible ... to prove the existence of an independent collateral agreement. The facts of each case must control the application of, and the exceptions to,

the parol evidence rule." *Starnes v. First Am. Nat'l Bank*, 723 S.W.2d 113 (Tenn.Ct. App.1986) (citation omitted). In *Early*, the Supreme Court of Tennessee held:

> the "test for determining whether the alleged oral agreement is distinct and separate from the contract evidenced by the writing, so as to permit proof thereof by parol or extrinsic evidence not inconsistent with or contradictory to the writing, is whether the oral agreement is one which, considering the circumstances of the parties, the subject-matter, and the nature of the writing, would ordinarily have been embodied in the written instrument, had the parties intended they should be bound thereby."

192 Tenn. at 473, 241 S.W.2d at 535 (quoting 70 A.L.R. 759). *See also In re Tom Woods Used Cars, Inc.*, 23 B.R. 563 (E.D. Tenn.1982).

The FDIC argues that the participation certificates are full and complete agreements, and that any right to require C & C Knox to repurchase the loans in question would ordinarily be embodied in a loan participation certificate. *See Farmers & Merchants Bank v. Petty*, 664 S.W.2d 77, 81 (Tenn.Ct.App.1983) ("Where a note is an unconditional promise on its face, parol evidence is inadmissible to show an oral condition."). We agree. The certificates set forth a definite price, interest rate and term. Moreover, the certificates contain language wherein C & C Knox specifically reserved the right to repurchase the participations at any time. The fact that C & C Knox established its right of repurchase in writing suggests that any such reciprocal right on behalf of First State would also ordinarily be contained in the writing. Therefore, we hold that the alleged oral agreement between First State and C & C Knox is not an *independent* collateral agreement, as it would ordinarily be contained in a writing evidencing a loan participation agreement. *See Tri–Cities Forklift Co. v. Conasauga River Lumber Co.*, 700 S.W.2d 548, 551 (Tenn.Ct.App.1985) (parol evidence rule barred extrinsic evidence that parties intended that lessee have option to purchase following expiration of the lease).

First State argues that even if the oral agreement is not an independent collateral agreement, it is still admissible because the oral agreement induced it to purchase the participations. In *Kilday v. Baskette*, 36 Tenn.App. 479, 259 S.W.2d 162 (1953), the court permitted parol evidence that Baskette had agreed Kilday could prepay promissory notes to Baskette before maturity without penalty, even though the notes were silent on the subject of prepayment. Baskette subsequently refused to accept early payment because the notes provided for a higher interest rate than he could receive from other investments. The court held that representations and statements made as an inducement to the contract and forming a basis or consideration of it were admissible and not barred by the parol evidence rule. The court stated:

> Whether the parol agreement be treated as collateral to the written memorial of the sale or as inducement to the purchase the result is the same.
>
> The exception to the parol evidence rule relative to inducing statements or collateral agreements applies to promissory notes as well as to other contracts where the original parties are the parties to the contest.

*Kilday*, 36 Tenn.App. at 483, 259 S.W.2d at 164. *See In re Estate of Espey*, 729 S.W. 2d 99, 102 (Tenn.Ct.App.1986) (parol evidence is admissible to prove circumstances surrounding the making of mutual wills and a contract to make the wills irrevocable.).

As indicated above, the oral agreement is not inconsistent with the loan participation certificates, and therefore would not be inadmissible for that reason. The key is whether "the representations and statements are made as an inducement to the contract, and form the basis or consideration of it." *Kilday*, 36 Tenn.App. at 482–83, 259 S.W.2d at 164.

When the conduct of the parties is examined, the record does not indicate that First State considered the oral agreement from C & C Knox to be an inducement or otherwise the consideration for the loan partic-

ipations. There is no evidence contradicting that both First State and C & C Knox were honest and forthright in completing the reports required to be filed with the FDIC, and that both banks took these reports seriously and responded with complete responses. Therefore, these reports should be viewed as pertinent and truthful recitations of any terms of any agreement between First State and C & C Knox. These reports demonstrate that First State had accepted the participations without recourse and that C & C Knox had no agreement or obligation to repurchase the participations. Thus, First State's conduct and written records negate its claim that it was induced to purchase the loans by C & C Knox's oral agreement. If an oral agreement did serve as consideration for the loan participations, then it would be reflected in First State's records.[5]

## B. *Federal Public Policy*

■ The district court also held that the oral agreement between First State and C & C Knox was unenforceable because it was violative of a federal public policy protecting the FDIC against misrepresentations as to the assets and obligations of the banks it insures. Pursuant to the Supreme Court's holding in *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), the district court held that First State could not rely on any unwritten agreement when its own records denied the existence of the agreement. We agree.

In *D'Oench*, the Supreme Court acknowledged the existence of a "federal policy to protect [the FDIC] and the public funds which it administers against misrepresentations as to the securities or other assets in the portfolios of the banks which [the FDIC] insures or to which it makes loans." *Id.*, 315 U.S. at 457, 62 S.Ct. at 679; *see also Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987). *D'Oench*

involved a note given to a bank with the understanding that the bank would not seek to enforce the obligation. When the bank failed, the FDIC sought to collect on the note. The debtor contended that, pursuant to the side agreement, he was not liable on the note. He also contended that he did not intend to mislead banking regulators and that no one had been harmed by the arrangement. The Court rejected his argument, however, holding that an accommodation maker who takes part in a secret agreement may not take advantage of the undisclosed arrangement which public policy condemns. *D'Oench*, 315 U.S. at 458, 62 S.Ct. at 680.

The federal policy enunciated by the Court in *D'Oench* is mandated by the necessity for accuracy in regulatory reports. To be insured, a bank must be examined by the FDIC or by other regulatory authorities upon which the FDIC is authorized to rely. The purpose of a bank examination is to determine, as accurately as possible, the bank's financial condition and to identify unorthodox or dangerous lending practices. To carry out its duties, the FDIC must be able to rely on the bank's books and records as being accurate and reflecting the true state and condition of the insured bank's affairs. When an insured bank enters into oral agreements which are not fully and accurately memorialized in the bank's records, the true nature of the bank's rights and obligations might be obscured, and examiners can be misled, with the result that both depositors and the FDIC insurance fund are in jeopardy. In sum, the FDIC must be able to rely on the books and records of insured banks.

The holding in *D'Oench* was subsequently codified in 12 U.S.C. § 1823(e), which provides:

> No agreement which tends to diminish or defeat the right, title or interest of the

---

5. In its complaint, First State sought reformation of the written loan participations to reflect the oral agreement with C & C Knox. In Tennessee, as in most states, the parol evidence rule does not apply to suits in equity seeking reformation. *Rentenbach Eng'g v. General Realty Ltd.*, 707 S.W.2d 524, 526–27 (Tenn.Ct.App. 1985). Although the district court's opinion does not reflect that the court considered reforming the writings in question, First State has not raised the issue on appeal. *See McMurphy v. City of Flushing*, 802 F.2d 191, 198–99 (6th Cir.1986) (issues raised in the district court yet not pursued on appeal are considered abandoned.).

[FDIC] in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the [FDIC] unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

As First State notes, public policy as codified in § 1823 disfavors misrepresentations by insured banks as to the collectibility of assets in their loan portfolios. As First State also correctly notes, all the cases relied on by the district court and the FDIC are cases in which the FDIC, either as receiver or in its corporate capacity after having purchased assets or loans from itself as receiver, sought to collect on promissory notes which were assets of a closed bank. *See FDIC v. Wood*, 758 F.2d 156 (6th Cir.), *cert. denied*, 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 286 (1985); *FDIC v. Hatmaker*, 756 F.2d 34 (6th Cir.1985). Moreover, the FDIC concedes that it is not asking the court to apply section 1823(e) and that it is not relying on the statute to preclude enforcement of the alleged oral agreement.

Initially, First State argues that the oral agreement was not secret and was not misleading to the FDIC. However, it is undisputed that the FDIC reports submitted by both First State and C & C Knox did not disclose any oral repurchase agreement, and instead disclosed the loans as without recourse. Since the credit risk of a loan clearly affects a bank's financial status, the failure to disclose the oral agreement was misleading as to the financial condition of both C & C Knox and First State. If First State were allowed to return its participations at any time and for any reason, the participations would be illusory and neither First State's nor C & C

Knox's records accurately reflected the true nature of these transactions.

First State argues that the rule of *D'Oench* should be limited to situations involving misrepresentations regarding the collectibility of assets in the loan portfolio of banks and should not be applied to misrepresentations regarding the liabilities of a bank. As First State correctly notes, its success would not in any way diminish the total amount of assets owned by C & C Knox at closing, but would only add one more creditor to partake in the division of those assets. This is not a situation, as in *D'Oench*, where a secret side agreement would turn a bank loan into a gift by releasing either a debtor or guarantor. In theory, First State is correct in that they are not escaping with any assets of the bank. Instead, First State is seeking to enforce an obligation wherein the loans would be traded back to C & C Knox for their present value. That in no way depletes the assets of C & C Knox, because they are receiving the loans in return. It is only when we acknowledge that the notes are uncollectible that there is any arguable depletion of C & C Knox's assets and then only in that other creditors would take a smaller share.

The FDIC urges this court not to give the holding in *D'Oench* the limited effect argued by First State, and argues that *any undisclosed agreement* which would affect a bank's financial condition to the detriment of the public should be denied enforcement under *D'Oench*, including side agreements which may reduce the value of an asset as well as side agreements which may increase a bank's liabilities. *See Dasco, Inc. v. American City Bank & Trust*, 429 F.Supp. 767 (D.Nev.1977). The FDIC argues that to be properly reflected on the balance sheet of a selling bank, loans and loan participations which are subject to an agreement to be purchased should be listed as loans to other financial institutions. If the purchasing bank could require the selling bank to repurchase the assets for full value, the purchasing bank did not assume any risk associated with the borrower's ability to repay the debt. Accordingly,

such an agreement to repurchase allows a purchasing bank to avoid any credit risk that the borrower may represent and leaves all the risk on the selling bank even though a participation was sold. On the other hand, loans and participations purchased without recourse carry with them the credit risks of the underlying borrower. If the borrower defaults, the purchasing bank absorbs the loss the same as if the purchasing bank had originated the loan itself.

However, the FDIC's practices do not reflect that it considers some risk to be incurred with every loan participation. The FDIC's Regional Director testified that loan participations with recourse are treated as a borrowing, and that the FDIC usually repays banks from which funds have been borrowed in full even if the underlying agreement was parol. Clearly, the FDIC does not consider all oral agreements unenforceable, or otherwise it would not repay oral agreements wherein funds were borrowed. Accordingly, we do not hold that this financial situation is inherently in violation of federal public policy. An undisclosed oral agreement is not unenforceable under *D'Oench* merely because it is oral or undisclosed.

■ However, what we are considering is not simply an undisclosed oral agreement. It is an oral agreement that is in contradiction with the financial records submitted by both First State and C & C Knox to the FDIC. In our view, the misleading nature of First State's behavior does serve as a proper basis for denying enforcement of the oral agreement.[6] Therefore, we hold that the *D'Oench* estoppel doctrine precludes the enforcement of any oral agreement that is in contradiction with representations made to the FDIC. The focal point of the analysis is not on the type of transaction, but on whether it is in contradiction with what the bank has stated to the FDIC, or is part of any effort to deceive or mislead the FDIC as to the

financial status of any banking institution. *See FDIC v. Investors Assocs. X. Ltd.,* 775 F.2d 152, 154 (6th Cir.1985). Thus, if a bank engages in misleading or deceptive behavior toward the FDIC with regard to either its assets or liabilities, it may not subsequently take a contrary position in any proceedings involving the FDIC.

First State argues that since the FDIC was on notice about the oral agreement from various correspondence and communications available to the FDIC, it should be estopped to deny the existence of the oral agreement and/or that First State's records were misleading. However, the FDIC's knowledge of the existence of the oral agreement is irrelevant as to the agreement's enforceability. *See Investors Assocs.,* 775 F.2d at 156; *see also FDIC v. Merchant's Nat'l Bank,* 725 F.2d 634 (11th Cir.), *cert. denied,* 469 U.S. 829, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984). The protection afforded by the *D'Oench* estoppel doctrine would be of no value if the parties could avoid its effect by making the FDIC aware of a secret agreement before a bank failure. Holding otherwise would encourage less than truthful disclosure and would encourage last-minute lobbying regarding any inaccuracies by notifying the FDIC of those inaccuracies only when the bank appears to be on the brink of failure. On the contrary, federal public policy is better enhanced by encouraging banks to be open and honest on their books in order to prevent bank closures. *See Langley,* 108 S.Ct. at 403.

Moreover, the *D'Oench* estoppel doctrine is not defeated by evidence that bank regulators were not, in fact, misled by the attempted scheme. In *Investors Assocs.,* we held that in applying the *D'Oench* doctrine, "the only relevant inquiry" is whether the individual or institution lent itself "to a transaction which is likely to mislead banking authorities." 775 F.2d at 154. *See D'Oench,* 315 U.S. at 460, 62 S.Ct. at 681; *FDIC v. First Nat'l Finance Co.,* 587 F.2d 1009 (9th Cir.1978). We explained that:

---

**6.** The FDIC was undoubtedly misled as to the financial status of both banks. Indeed, First State understated its financial status while allowing C & C Knox to overstate its financial status. It is, therefore, difficult to believe that First State had no intent whatsoever to mislead or deceive the FDIC.

the focus in applying *D'Oench* is upon the fact that the maker's defense arises out of a fraudulent transaction and not upon the knowledge of the FDIC. Regardless of the FDIC's knowledge of the circumstances surrounding the transaction, the fraudulent scheme is still contrary to public policy and the wrongdoer still should not be able to benefit from something that transpired during the course of such a scheme.

*Investors Assocs.*, 775 F.2d at 155–56.

In *FDIC v. Leach*, 772 F.2d 1262 (6th Cir.1985), we suggested that "the rationale of *D'Oench* seems to be limited to situations in which the maker of the note knowingly contributes to the misrepresentation." *Id.* at 1267. In this case, however, there is no doubt that First State did contribute to the misrepresentation by indicating in the reports it filed with the FDIC that the loans in question were without recourse, when in fact it is now arguing that they were with recourse pursuant to the oral agreement with C & C Knox. This is not a case where an innocent individual or entity is being penalized because of another's actions.

Finally, First State argues that the FDIC prevented C & C Knox from repurchasing the participations from First State while allowing C & C Knox to repurchase similar loan participations from other financial institutions. However, the record shows that FDIC did not grant permission for any of these transactions, but C & C Knox repurchased the loans because it concluded that it had a legal obligation to repurchase the participations. As the FDIC correctly notes, the Temporary Cease and Desist Order allowed C & C Knox to repurchase participations when there was a legal obligation to do so. The fact that both C & C Knox and First State wrote the FDIC seeking permission for C & C Knox to repurchase the loans shows that the parties had some question as to whether C & C Knox had a legally binding obligation to repurchase the notes. Otherwise, they would not have sought FDIC permission.

Finally, any action or inaction by C & C Knox does not estop or otherwise affect the defenses available to the FDIC as a receiver. The legal distinction between the bank and the FDIC receiver has long been established. The FDIC, as receiver of a failed bank, does "not simply step into the private shoes of local banks," but most often stands in a litigation position substantially superior to that which a failed bank would have occupied had it met with the same claim. *D'Oench*, 315 U.S. at 472, 62 S.Ct. at 686 (Jackson, J., concurring). Thus, even if the oral agreement might have been enforced against C & C Knox, it is not automatically enforceable against the FDIC. *See FDIC v. Armstrong*, 784 F.2d 741, 745 (6th Cir.1986) (FDIC takes notes free of defenses of fraud in the inducement and failure of consideration); *Leach*, 772 F.2d at 1265–66 (FDIC takes notes free from defense of usury). While C & C Knox might not have avoided enforcement because of the misrepresentations of First State in its documents to the FDIC, the FDIC is clearly so empowered.

### III.

In conclusion, we do not find that the district court's findings of fact were clearly erroneous or that it misapplied the applicable law. Accordingly, for the reasons stated, the judgment of the district court is AFFIRMED in its entirety.