**FAIRFIELD SIX/HIDDEN VALLEY PARTNERSHIP, et al.**

v.

**RESOLUTION TRUST CORPORATION.**

No. JFM–93–2733.

United States District Court, D. Maryland.

Aug. 3, 1994.

David M. Williams, Chestertown, MD, for plaintiff.

Robert J. Proutt, Rosenberg, Proutt, Funk & Greenberg, Baltimore, MD, for defendant.

## MEMORANDUM

MOTZ, District Judge.

This case arises from a failed real estate transaction involving the Hidden Valley Partnership, Daniel Billings, and Daniel Gerres (collectively "plaintiffs"), Kardon Industries ("Kardon") and the Potomac Savings and Loan Association ("Potomac"). Plaintiffs had agreed to purchase real estate from Kardon and had allegedly received a promise from Potomac that it would loan them the money to complete the transaction. Potomac reneged on this promise and the land deal fell through. Plaintiffs sued Potomac in state court but the savings and loan crisis intervened and Potomac went into receivership. Plaintiffs subsequently sued Potomac's receiver, the Resolution Trust Corporation ("defendant").[1]

Plaintiffs' complaint states seven causes of action: fraud, breach of contract, negligent performance of contract, interference with contract and business expectancy, malicious and wrongful interference with economic relationships, negligent misrepresentation and violations of Maryland's antitrust statute.[2]

---

1. In August of 1992, defendant reorganized and rechartered Potomac Savings and Loan Association as Potomac Savings Bank, FSB.

2. Plaintiffs initially sought punitive damages on their fraud and malicious interference claims. They now acknowledge, however, that punitive damages are not recoverable against the RTC.

Defendant has filed a motion to dismiss the complaint in its entirety for failure to state any claim upon which relief can be granted. Alternatively, defendant seeks summary judgment as to each of the claims. Plaintiffs concede that they have no viable anti-trust claim but in all other respects oppose defendant's motion.

## I.

In March of 1985, plaintiffs Billing and Gerres, along with Charles Staples, formed the Hidden Valley Partnership for the purpose of purchasing and developing 173 acres of land near Newark, Delaware. On April 1, 1985, plaintiffs agreed to buy the land from Kardon for $825,000. Around the same time, plaintiffs approached Potomac in order to procure a loan to help them purchase the property. According to plaintiffs, Potomac agreed to lend them enough money to purchase and develop the land in exchange for a market interest rate and 50% of the profits that plaintiffs would get from the development. Plaintiffs agreed to these terms and went about closing the deal with Kardon. In early May, Kardon agreed to delay the payment of $600,000 of the purchase price for two years if plaintiffs could procure an irrevocable letter of credit for that amount issued to Kardon. Plaintiffs allege that Potomac agreed to issue the letter of credit.

By the middle of July, plaintiffs' project was allegedly moving along well and they borrowed $50,000 from Potomac to pay the legal expenses and engineering fees involved in preparing for their closing with Kardon. On October 1, plaintiffs and Kardon agreed that they would close on the property at the end of the month and Kardon demanded that plaintiffs produce the $600,000 letter of credit. Plaintiffs then requested the letter from Potomac, which refused to issue it. Allegedly, Potomac said that instead it intended to take over plaintiffs' rights under their land purchase agreement and offered them salaried jobs to continue work on the development. When plaintiffs indicated that this was unacceptable, Potomac stated that it would not interfere with plaintiffs' contract rights and would issue the letter of credit in return for the payment of $50,000.00. Plain-

tiffs refused to pay this sum and sought alternative financing. After their efforts proved unsuccessful, plaintiffs assigned their contract with Kardon to First State Enterprises which assumed their debts and purchased the land.

## II.

### A.

12 U.S.C. § 1821(d)(9)(A) provides that "any agreement which does not meet the requirements set forth in § 1823(e) of this title shall not form the basis of, or substantially comprise, a claim against the ... [RTC]." Section 1823(e) provides, in turn, that in order to valid against the RTC, a loan agreement must (1) be in writing; (2) be executed by the parties contemporaneously with the acquisition by the savings and loan association of a security interest in the underlying asset, (3) be approved in a duly recorded minute by the board of directors or loan committee of the association and (4) be continuously maintained from the time of its execution as an official record of the association. These requirements are derived from what is known as the *D'Oench, Duhme* doctrine, established by a 1942 Supreme Court decision holding that a borrower cannot assert an alleged oral side agreement as a defense to a suit brought by the FDIC to enforce a promissory note. *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). Generally stated, "the purpose of the doctrine and the statute which codifies it is to permit the FDIC [here the RTC] to rely on bank records and to protect the FDIC [RTC] from secret agreements." *FDIC v. Hadid,* 947 F.2d 1153, 1157 (4th Cir.1991). The doctrine applies whether the borrower characterizes his claim based upon the agreement as one for breach of contract or one for fraud. *See Langley v. FDIC,* 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987).

In this case it is clear that Potomac's alleged agreement to provide financing for the Hidden Valley development project "substantially comprises" four of plaintiffs' claims

against the RTC.[3] The claims for breach of contract and negligent performance of contract are directly based upon the alleged enforceability of the agreement. Similarly, the alleged representations that underlie plaintiffs' claims for fraud and negligent misrepresentation are the terms of the alleged agreement—terms that plaintiffs allege Potomac never intended to honor. It is precisely such claims that *Langley* held are barred by *D'Oench, Duhme*. Therefore, unless the alleged agreement between plaintiffs and Potomac meets the requirements of Section 1823(e), those claims are barred by § 1821(d)(9)(A).[4]

### B.

■ The only written document to which plaintiffs can point allegedly giving rise to Potomac's obligation to provide a loan for the Hidden Valley project is a letter dated May 22, 1985 to Messrs. Gerres, Billings and Staples from F. Ripley Bowman, the Executive Vice President of Potomac. That letter stated as follows:

May 22, 1985

Messrs. Daniel Gerres
Donald Billings
Charles Staples
T/A Hidden Valley Development Company
c/o/ Piet H. vanOgtrop
Daley, Erisman & vanOgtrop

206 East Delaware Avenue

Newark, Delaware, 19711

Reference: Tax Parcel 09–013–00–040 and 09–013–00–041, also known as Fairfield Six, New Castle *County Delaware.*

Gentlemen:

This is to advise you of our intent to finance the acquisition and development of approximately 179.2± acres of ground situate [sic] adjacent to the existing corporate limits of the City of Newark, New Castle County, Delaware.

Initially we are granting you a loan in the amount of $50,000 to cover the initial soft costs, including legal expenses, engineering and consulting fees necessary to the pursuit of the annexation of the subject property to the City of Newark, Delaware in order to provide for that jurisdiction's facilities and amenities.

It is further our intention to obtain under acceptable conditions an interest bonus of a substantial portion of this contract not to exceed 50% of the cash flow, if any, created as a result of this development.

Trusting that this intention is in agreement with our mutual understanding, I am

Very truly yours,

/s/ F. Ripley Bowman

Executive Vice President

---

**3.** Because I am holding that plaintiffs' claims for breach of contract, negligent performance of contract, fraud and negligent misrepresentation are barred by 12 U.S.C. § 1821(d)(9)(A), I need not decide various contentions made by the RTC concerning alleged defects in those claims as a matter of Maryland common law. .I note, however, that I am satisfied that plaintiffs have pled their fraud claim with the specificity required by Fed.R.Civ.P. 9(b) and that, in light of the fact that plaintiffs allege that Potomac never intended to provide financing for the Hidden Valley project, the mere fact that Potomac's statements were promissory in nature would not negate a fraud claim. *See, e.g., Gross v. Sussex, Inc.,* 332 Md. 247, 630 A.2d 1156 (1993); *Finch v. Hughes Aircraft Co.,* 57 Md.App. 190, 232, 469 A.2d 867, 888 (1984); *cf. Weisman v. Connors,* 312 Md. 428, 540 A.2d 783 (1988). On the other hand, I would be inclined to rule that in light of the fact that the parties were "business entities dealing at arms length," Potomac did not owe plaintiffs the extra-contractual duty of care necessary for the assertion of a negligent misrepresentation claim.

*Waller v. Maryland National Bank,* 95 Md.App. 197, 228, 620 A.2d 381, 396 (1993); *but see Weisman v. Connors, supra; Giant Food, Inc. v. Ice King, Inc.,* 74 Md.App. 183, 536 A.2d 1182 (1988).

**4.** Section 1821(d)(9)(A) is broader in its prohibitive effect than the *D'Oench, Duhme* doctrine. Courts are split over whether *D'Oench, Duhme* bars affirmative claims by the borrower as well as defenses asserted by them. *Compare First State Bank v. City and County Bank,* 872 F.2d 707 (6th Cir.1989) (holding that *D'Oench, Duhme* bars both types of claims) *with Beighley v. FDIC,* 868 F.2d 776 (5th Cir.1989) (holding that *D'Oench, Duhme* only bars defenses) and *Tuxedo Beach Club Corp. v. City Federal Savings Bank,* 749 F.Supp. 635 (D.N.J.1990) (same). The language of section 1821(d)(9)(A), on the other hand, does not distinguish between affirmative claims and defenses, instead baring "claims" based on agreements that do not meet the requirements of section 1823(e).

As a threshold matter, this letter is signed only by Potomac, not by plaintiffs, and therefore does not meet the requirement of § 1823(e)(2) that the writing be executed both "by the depository institution and any person claiming an adverse interest thereunder."[5] That aside, however, it is clear that the letter is not sufficiently specific in its terms to constitute a binding agreement.

Although Maryland courts do not favor the destruction of contracts due to uncertainty, *Quillen v. Kelley,* 216 Md. 396, 407, 140 A.2d 517, 523 (1958), they will not enforce a contract if it is so vague that the court cannot discern the intention of the parties from it. *L & L Corp. v. Ammendale Normal Institute,* 248 Md. 380, 236 A.2d 734 (1968). Thus, a contract will not be enforced under Maryland law when a material term is left completely undefined by the parties. *L & L Corp,* 248 Md. 380, 236 A.2d 734 (holding a contract alleged to have modified the price term of an original contract to be void when the modified price is missing); *Strickler Engineering Corp. v. Seminar, Inc.,* 210 Md. 93, 122 A.2d 563 (1956) (holding an agreement for an extension of time to be void when the agreement fails to specify a specific time or a triggering event); *Robinson v. Gardiner,* 196 Md. 213, 76 A.2d 354 (1950) (holding an insurance policy that agreed to keep the insured free from all liability that might arise out of the ownership of his car to be unenforceable). Similarly, the Maryland Court of Appeals has refused to enforce a contract in which the existence of the subject matter is left entirely to the discretion of one party. *Meyers v. Josselyn,* 212 Md. 266, 129 A.2d 158 (1957).

While there is no Maryland case law directly addressing vagueness in the context of loan agreements, cases involving a party in a real estate transaction attempting to specifically enforce a contract provide a close analogy since they usually concern contracts contingent on the purchaser obtaining financing. In these types of cases, Maryland courts require a fair amount of detail in regard to the nature of the financing before they will enforce the contract. In *Imas Gruner & Associates, Ltd. v. Stringer,* 48 Md.App. 364, 427 A.2d 1038 (1981) the Court of Special Appeals refused to specifically enforce a contract, contingent on obtaining a mortgage, when the contract failed to specify the amount, term, and interest rate of the mortgage. Similarly, in *Chambers v. Jordan,* 257 Md. 144, 151, 262 A.2d 505, 509 (1970) the Court of Appeals held that a real estate contract, also contingent on financing, that "specified neither term, interest rate nor when payments of interest or principle would be payable" was unenforceable. Finally, in *Standard American Homes v. Pasadena Bldg. Co.,* 218 Md. 619, 147 A.2d 729 (1958) the Court of Appeals affirmed a denial of specific performance where the contract failed to state the time, mode, interest rate or terms of payment.[6]

Case law from other jurisdictions that directly addresses the issue of vagueness in loan agreements harmonizes nicely with these Maryland real estate transaction cases. Courts throughout the country have repeatedly refused to enforce loan agreements that are missing terms such as the amount of money to be lent, the interest rate to be charged, the mode of repayment, when the repayments were to commence or end, the amount of periodic payments, and the nature of the security. *See, e.g., Stanley Boot Co., Inc. v. Bank of El Paso,* 847 S.W.2d 218

---

5. Neither the minutes of Potomac's board of directors nor of its loan committee reflect that the agreement to finance the Hidden Valley partnership was ever approved as required by § 1823(e)(3). Plaintiffs allege, however, that the loan was approved by the board of directors and entered in the minutes but that the minutes were destroyed by the chief executive officer of Potomac when federal investigators began to examine Potomac's records in search of improprieties. The plaintiffs offer the deposition of the chairman of Potomac's board to support at least the former of these allegations. Since § 1823(e) is intended to act as a disincentive to a borrower who, by making an unwritten agreement with the lender, involved himself (either wittingly, or unwittingly) to a scheme to mislead bank regulators, it would seem that an after-the-fact alteration of the association's minutes to delete reference to the approval of a loan should not bar the borrower from enforcing the agreement. I need not reach this question, however.

6. Real estate contracts need not contain a specific interest rate for the financing. *Paape v. Grimes,* 256 Md. 490, 260 A.2d 644 (1970).

(Tex.1992) (holding a contract to make available a $500,000 line of credit unenforceable absent evidence of interest rates or repayment terms of the loan); *Nelson v. Production Credit Association of the Midlands,* 729 F.Supp. 677 (D.Neb.1989), *aff'd,* 930 F.2d 599 (8th Cir.1991) (holding void for vagueness a loan agreement that failed to specify the amount of the loan, the interest rate, the method of repayment and the collateral); *Union State Bank v. Woell,* 434 N.W.2d 712 (N.D.1989) (holding void for vagueness an oral loan agreement that failed to specify the amount and duration of the loan, the interest rate, the method of repayment and the collateral); *Bonner v. Wachovia Mortgage Co.,* 142 Ga.App. 748, 236 S.E.2d 877 (1977) (holding that a development loan was void because it contained no mention of the amount of the loan, how or when property would be developed, or the rate of interest); *Labor Discount Center v. State Bank & Trust Co.,* 526 S.W.2d 407 (Mo.App.1975) (holding an oral agreement to continue financing to be insufficiently definite when due date, security, rate of interest, and time of repayment were not specified).

A comparison of the contracts held unenforceable in the Maryland real estate cases and the loan agreement cases from other jurisdictions with the alleged contract in this case demonstrates that the letter from Potomac to plaintiffs is too vague to be considered an actual contract. The letter is silent with respect to almost every material term of the agreement. It does not specify the amount or duration of the loan, the interest rate, or the method of repayment. The Court of Appeals has refused to enforce real estate contracts premised on financing the

attributes of which are so vague. *Chambers,* 257 Md. 144, 262 A.2d 505; *Standard American Homes,* 218 Md. 619, 147 A.2d 729. There is no logical reason why similar standards should not be applied to loan agreements themselves. That other states have already applied these standards simply confirms this view. Therefore, there was no written agreement between the parties sufficient to meet the requirement of § 1823(e)(1).

### III.

Plaintiffs' remaining claims are for tortious interference with contract and malicious and wrongful interference with economic relationships.[7] These claims are based upon the allegations that when it came time to close on the Hidden Valley property, Potomac refused to perform on its commitment to provide financing to plaintiffs, advising plaintiffs instead that it intended to take over plaintiff's contracts under their agreement with Kardon and offering them salaried jobs to continue work on the development. Although plaintiffs concede that Potomac backed away from this position, Potomac allegedly demanded the payment of an additional $50,000 to issue the letter of credit necessary to provide the financing.

To some extent these claims, like plaintiffs' other claims, depend upon the existence of a binding agreement between the parties for Potomac to provide plaintiffs with a loan for the purchase of the Hidden Valley Property. If there were no such agreement, Potomac's initial statement that it would not provide the financing and its subsequent demand for the

---

**7.** Defendant contends that because plaintiffs allege that they had a contract with Kardon to purchase the Hidden Valley property, they cannot assert a claim for malicious interference with economic relationships. The fallacy in this contention is that, as the Maryland Court of Special Appeals has elegantly stated, the two torts are not separate and independent but "two branches of a single tort that encompasses not only that form of tortious interference with a contract exemplified by wrongful inducement of a breach of contract, but also the broader form that encompasses other sorts of wrongful interference with contractual relations; or indeed, with business expectations, or economic relationships where no contract exists." *Lake Shore Investors v. Rite*

*Aid Corp.,* 67 Md.App. 743, 751, 509 A.2d 727, 731 (1986). Equally fallacious is a second contention made by defendant that plaintiffs cannot assert a viable claim for tortious interference with contract since they allege that it was they, not Kardon, who were induced to breach the contract. The Court of Appeals has recognized that a defendant may be liable for tortious interference of a contract where the plaintiff himself is the promisor and the defendant has prevented him from performing the contract or caused his performance to be more expensive or burdensome. *K & K Management v. Lee,* 316 Md. 137, 155, 557 A.2d 965, 974 (1989) (quoting Restatement (Second) of Torts, § 766A).

payment of $50,000 to issue the letter of credit would not in any way be wrongful. Nevertheless, it does not seem to me that this means that the agreement "form[s] the basis of, or substantially comprise[s]" plaintiffs' tortious interference claims within the meaning of § 1821(d)(9)(A). The focus, both substantively and temporally, of those claims differs from plaintiffs' contract, fraud and negligent misrepresentation claims. Potomac's allegedly wrongful acts giving rise to the tortious interference claims occurred approximately five months after it allegedly made its financing commitment, and those acts—independent of any accompanying breach of contract that occurred—constitute the gravamen of the alleged tortious interference.

Moreover, the possibility of a collusive agreement between a savings and loan association and one of its borrowers—the danger at which the *D'Oench, Duhme* doctrine and its statutory counterpart are directed—does not exist if the borrower's claim is based upon wrongful conduct engaged in by the association after a binding agreement, evidenced by then extant writings, to make a loan was made. Thus, if plaintiff can prove by a series of documents implementing the May 22, 1985 letter that by October, when Potomac allegedly used coercive tactics against plaintiffs to further its own financial interests, Potomac was contractually obligated to finance the purchase of the Hidden Valley property, plaintiffs' independent tortious interference claims are cognizable even if the documentation does not satisfy the requirements of 12 U.S.C. § 1823(e). Accordingly, RTC's motion to dismiss those claims is denied.

A separate order effecting the rulings made in this memorandum is being entered herewith.