OPRYLAND HOTEL, L.P.,  )
  )
  Plaintiff/Appellant,  )  Appeal No.
  )  01-A-01-9810-CH-00551
v.  )
  )  Davidson Chancery
MILLBROOK DISTRIBUTION  )  No. 97-1502-II
SERVICES, INC.,  )
  )
  Defendant/Appellee.  )

**FILED**

September 29, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

COURT OF APPEALS OF TENNESSEE

APPEAL FROM THE DAVIDSON COUNTY CHANCERY COURT

AT  NASHVILLE, TENNESSEE

THE HONORABLE CAROL L. McCOY, CHANCELLOR

CYRUS L. BOOKER
URSULA Y. HOLMES
Booker, Baugh & Grant
315 Deaderick Street, #1280
Nashville, Tennessee 37238-1280
  ATTORNEYS FOR PLAINTIFF/APPELLANT

DOUGLAS FISHER
Howell & Fisher
Court Square Building
300 James Robertson Parkway
Nashville, Tennessee 37201
  ATTORNEY FOR DEFENDANT/APPELLEE

REVERSED AND REMANDED

WILLIAM B. CAIN, JUDGE

# O P I N I O N

This is an appeal by Opryland Hotel from judgment of the Chancery Court of Davidson County relative to the cancellation by Millbrook Distribution Services, Inc., of a hotel reservation agreement. Constructed in the 1970's, Opryland Hotel had expanded in the ensuing years so that in the year 1993 it was one of the major convention centers in the country. Millbrook Distribution Services, Inc. was a foreign corporation, with corporate offices in Arkansas, seeking to hold its first convention of vendors, employees and customers in the middle of the year 1995.

I.      The Agreement Process

In August 1994 Steve Tanner, Learning Facilitator for Millbrook, met at length with David J. Furnish, Corporate Sales Manager for Opryland. Following this meeting, Furnish wrote a six page letter to Tanner. The understanding of this letter is vital to disposition of this case. The letter states in part:

> Dear Steve:
>
> It certainly was a pleasure meeting with you and Jim this week. Thank you for giving me a better understanding of Millbrook's convention needs and how Opryland Hotel can help facilitate in the success of your program.
>
> As we discussed, we do have available on a second-option basis the following dates:
>
> ROOM BLOCK
>
> | Friday | August 18, 1995 | 30 Rooms |
> |---|---|---|
> | Saturday | August 19, 1995 | 250 Rooms |
> | Sunday | August 20, 1995 | 550 Rooms |
> | Monday | August 21, 1995 | 550 Rooms |
> | Tuesday | August 22, 1995 | 950 Rooms |
> | Wednesday | August 23, 1995 | 750 Rooms |
> | Thursday | August 24, 1995 | 150 Rooms |
> | Friday | August 25, 1995 | Check-out |
>
> The sleeping room rate for this set of dates would be $125.00, single or double occupancy.
>
> Also available on a second-option basis is 68,000 square feet of our Ryman Exhibit Hall. It would be available from August 21, 1995, at 12:01 a.m. with complete teardown on August 25, 1995, at 5:00 a.m. The rental for the Exhibit Hall would be a onetime charge of $2,000.00.
>                                    . . .
> Select from among 1,891 deluxe rooms, including 160 suites, most overlooking the spectacular Cascades, a two-and-a-half-acre water garden, or the beautiful 19th-century Victorian-style Conservatory. Both are glass-covered and provide

your attendees with acres of breathtaking waterfalls, sculpted rock gardens, and thousands of tropical plants and flowers.

Moreover, our convention facilities are truly one of a kind and designed to contribute to the success of your meeting. Our 74 meeting rooms encompass 300,000 square feet, more than any other Hotel in the nation. Designed for versatility and flexibility, each meeting room is located in close proximity to major guest areas. Additionally, Opryland Hotel offers you 42,000 square feet of prefunction areas that vary in size and shape to accommodate every need.

. . .

Opryland Hotel sincerely wants Millbrook's business. As we have discussed, I will be in constant contact with you as we try to resolve the second-option dilemma. During the interim, if I can be of any other service or can provide Millbrook with any other information regarding 1995, 1996, or 1997 dates, please do not hesitate to contact me directly.

Sincerely,

David J. Furnish
Corporate Sales Manager

Thus does this August 12, 1994 letter lay out a plan for a Millbrook Convention from August 18, 1995 through August 25, 1995, reserving 3,230 room nights at $125.00 per room night with choice from 1,891 deluxe rooms, including 160 suites.

This letter also contains the following:

Also, we have broken ground for our next expansion due to be completed by June 1996. The new wing, to be named the "Delta," will include 979 new guest rooms for a total of 2,870, in addition to new meeting and exhibit space. Also featured will be an indoor river, a 40,000-square-foot antebellum mansion, additional dining and shopping outlets.

Arrangements for the 1995 Millbrook convention did not materialize and Millbrook held its first convention in Orlando, Florida. Negotiations continued between the parties for the 1996 convention and resulted in a September 8, 1994 agreement, providing in material part as follows:

We are pleased to confirm our discussions regarding your meeting and to present the Hotel's policies and procedures enabling us to serve as your host.

The following guest rooms have been reserved:

| Thursday | July 11, 1996 | 15 Rooms |
|----------|---------------|----------|
| Friday | July 12,1996 | 30 Rooms |
| Saturday | July 13, 1996 | 350 Rooms |
| Sunday | July 14, 1996 | 700 Rooms |
| Monday | July 15, 1996 | 700 Rooms |
| Tuesday | July 16, 1996 | 700 Rooms |
| Wednesday | July 17, 1996 | 30 Rooms |

The above block includes 4 suites. The styles of suites include 1 two-bedroom Presidential suite, and 3 one-bedroom fifth-floor suites. The Presidential suite will be complimentary, and the 3 one-bedroom fifth-floor suites will have a complimentary parlour with the sleeping room at the group rate.

We will reserve the above room block until September 28, 1994, at which time we will need a signed copy of the agreement verifying confirmation. If confirmation has not been received by this time, Opryland Hotel reserves the right to release these dates for sale. In the event we have a definite request for your dates prior to your option date, we will contact you for a decision and written confirmation which must be made within three (3) business days.

Naturally, this room block should be evaluated periodically, particularly following your July 1995 convention to cover any changes in your arrival/departure pattern or room usage. At that time, we will review the contracted room block with you and adjust it accordingly based on availability. Additional charges could be incurred if your final pickup falls below 80 percent of the original block on a nightly basis.

GROUP RATES

Firm and guaranteed room rates will be quoted within one year prior to your function. For comparison, had you elected to meet with us in 1995, your net, non-commissionable room rates would have been $125.00, single and $125.00, double occupancy. Opryland Hotel will guarantee a maximum 6 percent cap on this rate for your 1996 convention dates. On an optional basis, our garden terrace rooms are an additional $40.00. Rates are subject to the existing 8 1/4 percent sales tax and 4 percent room tax. Group rates will be available three days prior to arrival and three days after departure, on space-available basis. Each additional person to a room is $15.00. Children 12 years and under are free when occupying the same room as their parents.

RESERVATIONS

To allow us to resell the few rooms you may not use within your block and to reduce your ultimate liability for unused rooms, we require that all individual reservations be received by June 11, 1996. Room reservations received by this date will be confirmed at your group rate; after this date they will be confirmed on a space-available basis. All reservations must be accompanied by one night's deposit or guaranteed by a major credit card. Deposits are only refundable for cancellations occurring three days prior to arrival.

. . .

CANCELLATION POLICY

Should it become necessary for you to cancel your conference with us, we would be in a difficult position to try to resell your room nights, which would result in lost revenue for our Hotel. We will, however, attempt to resell the room nights that were reserved for you and would only assess a cancellation fee for those room nights not resold over the initially agreed-upon dates. This fee would be based upon the unsold room nights multiplied by your established group rate for that period.

The above contract for the 1996 convention was executed by Mr. Furnish for Opryland Hotel on September 9, 1994, and executed by Mr. Robert A. Sigel for Millbrook on October 11, 1994. A contemporaneous addendum to this

4

contract was agreed to by the parties, providing in pertinent part:

> The cancellation policy found on Page 6 of the original contract will be replaced by the following paragraphs, and will become legally binding.
>
> Should Millbrook find it necessary to cancel its 1996 Convention contracted to be held at Opryland Hotel the following cancellation charge would apply:
>
> * If the Millbrook convention is cancelled between October 10, 1994, and January 11, 1995, no cancellation charge will be accessed. [sic]
>
> * If the Millbrook convention is cancelled between January 12, 1995, and July 11, 1995, Millbrook agrees to pay Opryland Hotel $75,000.00 in damages. This charge will be payable at the time of cancellation and will release Millbrook from any further financial obligations in reference to the cancelled convention. We will attempt to resell you[r] room nights over the initially agreed upon dates and will refund the appropriate dollar figure, if any to Millbrook for any room nights we were able to resell up to $75,000.00.
>
> * If the convention is canceled between July 12, 1995, and the convention date of July 11, 1996, Opryland Hotel would assess a cancellation fee for those room nights not resold over the initially agreed upon dates. This fee would be based upon the unsold room nights multiplied by your established group rate for that time period, and will not exceed a $300,000.00 charge. We will attempt to resell your room nights and documentation for unsold room nights would be provided to Millbrook.

The 1995 Millbrook convention in Orlando was quite successful and on August 8, 1995, Millbrook sought additional room nights from Opryland for the 1996 convention, which were granted with a $130.00 per night room rate.

On September 19, 1995, Millbrook requested a Saturday night July 13, 1996 increase from 350 to 850 rooms; and a Friday night July 12, 1996 increase from 130 room to 750 rooms. Opryland could not supply these increases. This inability resulted in cancellation of the 1996 convention at Opryland by letter dated October 2, 1995, providing in pertinent part as follows:

> This will serve to notify Opryland Hotel that it has become necessary to cancel our 1996 conference at Opryland Hotel. Our purpose in doing so is not to hold the meeting at another facility or city. The Opryland Hotel is where we want to be; however, you are unable to provide us the necessary space on Saturday, July 13, 1996. We need 500 rooms and you do not have them available.
>
> Our October 4, 1994 agreement and addendum require you to attempt to resell our room nights, and we will expect to receive, after July 17, 1996, documentation for any unsold room nights.

5

II.    The Dispute

It is the position of Millbrook that it is only obligated to pay for any room nights that Opryland was unable to sell, based upon the 1,891 rooms asserted in the August 12, 1994 letter from Opryland to Millbrook. It is the position of Opryland that the 1,891 room cap was applicable only to the 1995 convention, since the same letter clearly pointed out to Millbrook that the "Delta" wing would be completed and ready for occupancy by the time of the Millbrook convention in July 1996. This "Delta" wing increased Opryland's maximum capacity from 1,891 rooms to 2,870 rooms.

The position of Millbrook can be more clearly understood by the cross-examination of Mr. Furnish, keeping in mind that Millbrook is asserting that the 1,891 room capacity for 1995, as set forth in the August 12, 1994 letter, is in fact a cap on the number of rooms to be used in calculating the Millbrook deficit resulting from the cancellation of the July 1996 convention.

Q.    Now, would you please look with me at the first sheet of the daily occupancy reports, the sheet dated July the 11th of 1996. That was the first day on which Millbrook was to have its meeting; is that right?
A.    That's correct.
Q.    On that day, can you tell from looking at the report how many rooms were sold?
A.    Well, you'll have to give me a second. I haven't looked at this in a couple of years.
Q.    How many rooms were occupied?
A.    Occupied? This says 2,753 rooms; is that correct?
Q.    That's what it says to me.
A.    Okay.
Q.    That's what it says to you?
A.    That's what it says.
Q.    Now, how many rooms were there in the part of Opryland Hotel which existed at the time the contract was made?
A.    Roughly 1891.
Q.    Precisely 1891, is that not right?
A.    Yes, sir.
Q.    So on July the 11th, the first day Millbrook was to have its meeting, you had sold more than 1891 rooms?
A.    Correct.
Q.    Look at the second day, which was to be the second day of Millbrook's meeting, July the 12th, 1996. How many rooms were occupied on that day?
A.    2,786.
Q.    So on that day there were certainly more rooms sold than were in the part of the Opryland Hotel which existed at the time the contract was made?
A.    Correct.
Q.    Look on the third day, July the 12th. How many rooms

6

on July the 12th were sold?

A. 2,605? My copy's not very good. It's a 6 or might be an 8. Has to be a 6.

Q. So on that date more rooms were sold than the 1891 rooms which existed when the contract was made?

A. Correct.

Q. Look on July the 14th, which is the next day, is it not, that the Millbrook meeting would have been held. How many rooms were sold that day?

A. 1,938.

Q. Again, more than the total rooms in existence when the contract was made?

A. Correct.

Q. Look at July the 15th. How many rooms were sold that day?

A. 2,095.

Q. Again, more than were in existence when the contract was made. Look at July the 16th. How many rooms were sold that day?

A. 2,033.

Q. And on July the 17th, how many rooms were sold?

A. 1,839.

Q. That's the number occupied; is that right?

A. 1,839 is what I'm reading on the occupied line.

Q. Now in addition, does that figure include the complimentary rooms?

A. It's my understanding it does.

Q. Do you know?

A. Not as a fact.

Q. Total guests. What is that number on July the 17th?

A. That's the total number of guests that you can trace. Sometimes that number varies. But if you know you are booking a double occupancy room, that might be two people per room, four people per room, three people per room. It's not a very concrete number. But it's just a number of people.

Q. Now, on July the 17th, that was to be the last day of the Millbrook meeting, right?

A. (Nodding yes.)

The chancellor accepted the position of Millbrook and held that the 1,891 rooms set forth in the August 12, 1994 letter constituted a cap on rooms chargeable to Millbrook and since it appeared that more than 1,891 rooms were booked on every night of the cancelled 1996 convention, except the night of July 17, 1996, when only 1,839 rooms had been booked, Millbrook was liable for a total judgment in the amount of $6,760.00, representing 52 unsold rooms.

If the chancellor is correct that the August 12, 1994 letter envisions an 1,891 room cap on the potential liability of Millbrook for cancelling the 1996 contract, the $6,760.00 in damages representing $125.00 per room on the 52 unsold rooms is correct, and the chancellor must be affirmed in this respect.

7

If, however, Opryland is correct in its position that the 1,891 room maximum represented only the 1995 convention, and that the same August 12, 1994 letter clearly informed Millbrook that the 979 additional rooms in the Delta wing would be ready for occupancy at the time of the Millbrook convention in July 1996, two separate scenarios are possible. The October 4, 1994 contract for the 1996 convention and the contemporaneous addendum thereto require Opryland in the event of cancellation to mitigate its damages by attempting to re-sell the Millbrook room nights after cancellation. Graphically, Opryland sets forth its two alternative theories of Millbrook liability based on 2,870 rooms, including the 979 room Delta wing, which was open and subject to occupancy at the time of the Millbrook convention in July 1996.

| Date | Rooms Reserved By Millbrook | Rooms Unsold When Canceled | Rooms Sold After Canceled | Unsold Rooms as of Event Date | Millbrook's Liability Min. | Max. |
|---|---|---|---|---|---|---|
| Thursday July 11 | 25 | 601 | 567 | 34 | 0 | 25 |
| Friday July 12 | 130 | 887 | 881 | 6 | 0 | 6 |
| Saturday July 13 | 350 | 596 | 497 | 99 | 0 | 99 |
| Sunday July 14 | 875 | 1126 | 281 | 845 | 594 | 845 |
| Monday July 15 | 875 | 1133 | 436 | 697 | 439 | 697 |
| Tuesday July 16 | 750 | 1223 | 470 | 753 | 280 | 753 |
| Wednesday July 17 | 30 | 1224 | 276 | 948 | 0 | 30 |
| TOTAL | | | | | 1,313/2,455 | |
| TOTAL DAMAGES | | | | | Min. $170,690.00 Max. $319,150.00[1] | |

In explanation of this table it must first be remembered that while Opryland was obligated to mitigate its damages by reselling the Millbrook

---

[1]The figures in Appellant's table were corrected to reflect accurate math.

rooms, the contract between the parties nowhere provides that Opryland is required to first sell the Millbrook rooms before offering any of the 939 Delta wing rooms for sale.

The first column in the table shows the 3,035 room nights between July 11, 1996 and July 17, 1996 that were reserved by Millbrook. The second column displays the 6,790 room nights vacant in the hotel following the October 2, 1995 cancellation of the 1996 convention by Millbrook. This number of unsold room nights is based upon 2,870 rooms maximum, including the 979 rooms in the Delta wing and is inclusive of the cancelled Millbrook room nights. The third column indicates that after the October 2, 1995 cancellation of the Millbrook convention, Opryland sold a total of 3,408 room nights before the date July 11, 1996, when the cancelled Millbrook convention was to have started. These 3,408 room nights were sold in both the original 1,891 room hotel and the 979 room Delta wing, with no break-down as to which sections of the hotel were actually occupied. The fourth column shows the number of room nights unsold on the cancelled Millbrook convention dates, based upon the entire 2,870 room capacity of the hotel, without break-down as between the original 1,891 room hotel and the 979 room Delta addition. By this calculation there were 3,382 room nights vacant in the entire 2,870 room hotel from the period July 11 through July 17, 1996, these being the dates of the cancelled Millbrook 1996 convention.

The final column of the table represents a break down concerning Opryland's mitigation of damages under the contract. If Opryland is required by the contract to sell the cancelled Millbrook rooms first, then Millbrook has no financial obligation for the nights of July 11, 12, 13 and 17, 1996, because all room nights were sold on those nights. For July 14, 15 and 16, a total of 1,313 room nights remained unsold and based on the $130.00 per night obligation of Millbrook, would result in total damages of $170,690.00.

The last portion of the column is based upon the assumption that Opryland has no obligation to sell the Millbrook rooms first but, under industry standards, can place those cancelled room nights at the bottom of the inventory. This would

result in a total of 2,455 unsold room nights which, when multiplied by the $130.00 per night room rate, would result in damages of $319,150.00 owing by Millbrook to Opryland which would be reduced to $300,000.00 by the cap on liability contained in the addendum to the October 4, 1994 contract.[2]

Since neither the all important August 12, 1994 letter, the October 4, 1994 contract, nor the contemporaneous addendum thereto make clear the decisive element of whether room night vacancies are to be calculated under an 1,891 cap, or the 2,870 rooms inclusive of the Delta wing, this dispute cannot be resolved under *Petty v. Sloan*, 197 Tenn. 630, 277 S.W.2d 355, 360 (Tenn. 1955) and its progeny. Intent of the parties is not plain and unambiguous as to be susceptible to determination under *Cookeville P.C. v. Southeastern Data Systems*, 884 S.W.2d 458 (Tenn. App. 1994). Rather we are faced with a situation akin to *Pettyjohn v. Brown Boveri Corp.*, 476 S.W.2d 268 (Tenn. App. 1971).

Therein the court said:

> In *Petty v. Sloan*, 197 Tenn. 630, 277 S.W.2d 355 (1954), the Court stated that when the language of a contract is plain, simple and unambiguous, the following rule found in *Smithart v. John Hancock Mutual Life Ins. Co.*, 167 Tenn. 513, 525, 71 S.W.2d 1059, 1063 shall apply:
>> "It is the function of a court to interpret and enforce contracts as they are written, notwithstanding they may contain terms which may be thought harsh and unjust. A court is not at liberty to make a new contract for parties who have spoken for themselves."
> Therefore, if the contract is plain, simple, unambiguous, and susceptible to only one possible interpretation, these Assignments of Error should be sustained. On the other hand, if it does not meet these requisites, the Chancellor would not be confined to the instrument alone in reaching a proper interpretation of the instrument. We hold the Trackman letter is neither plain, simple, nor unambiguous, and the Chancellor was correct in admitting evidence tending to show the circumstances of the agreement. Furthermore, the test as to the application of the parol evidence rule is whether the testimony as to oral agreements or negotiations varies or contradicts the instrument in question or merely explains same. If the testimony merely explains same, it does not violate the rule. *Marron v. Scarbrough*, 44 Tenn. App. 414, 314 S.W.2d 165 (1958).
>
> . . .

---

[2]Any rooms that were out of order on a particular night because of plumbing defects or other problems rendering them unsuitable for occupancy and rooms designated as complimentary are not included in any of the calculations of room night vacancies.

> The Chancellor found, and we agree, that an examination of the Trackman letter alone reveals that it is unclear and is possibly susceptible to more than one meaning. This being true, it was the Court's duty to ascertain the intention of the parties by considering evidence of the circumstances surrounding the making of the agreement and to the best of its ability place itself in the situation of the parties at the time of the agreement in order to properly judge the meaning of the words used, and to correctly apply them. *Commerce Street Co. v. Goodyear Tire & Rubber Co.*, 31 Tenn. App. 314, 215 S.W.2d 4 (1948).

*Pettyjohn v. Brown Boveri Corp.,* 476 S.W.2d 268, 271-272 (Tenn. App. 1971).

In looking to the circumstances surrounding the contractual relations between the parties, Millbrook suffers from the handicap of having to establish that the 1,891 rooms at Opryland, available in the August 12, 1994 letter in the context of an August 1995 convention, was a perpetual cap, not just for 1995 but for 1996 and 1997 as well. This is no small burden since the August 12, 1994 letter also makes it quite obvious that the 979 room Delta wing would be in the Opryland room available inventory, prior to the 1996 convention.

The October 4, 1994 addendum to the 1996 convention contract altered the original contract so as to break down the cancellation provision into three separate categories. First, if Millbrook cancelled between October 10, 1994 and January 11, 1995, no cancellation charge would be assessed. Then if Millbrook cancelled between January 12, 1995 and July 11, 1995, Millbrook would pay a flat $75,000.00 in damages, subject to a credit for such room nights as Opryland might be able to sell. Thirdly, if the convention were cancelled between July 12, 1995 and the beginning convention date of July 11, 1996, Millbrook would be liable for unsold room nights multiplied by the $130.00 per night room rate, subject to a $300,000.00 cap on liability. Here again, Opryland would attempt to resell these room nights upon cancellation.

> As early as February 14, 1995, David J. Furnish notified Steve Tanner:
>
> Dear Steve:
>
> Here are the brochures, and the continuous play video that you requested. I hope you find it helpful in promoting your convention scheduled to be held at Opryland Hotel in the Summer 1996.
>
> Steve, please do not hesitate to contact me if you need anything else. I have also enclosed our new meeting room specifications that will show you the "Delta" expansion. We are moving very quickly on this expansion, and are

ahead of schedule. 1996 is going to be a fantastic year at Opryland Hotel. When you have finished using the continuous play video, please return it to the Hotel to my attention.

I look forward to speaking with you again soon.

It was Millbrook that insisted upon the changes in number of available rooms that led to the cancellation of October 2, 1995, which was a time well within the third cancellation option contained in the addendum to the October 4, 1994 contract.

On cross-examination, Mr. Steve Tanner testified:

Q.      I believe you still have in front of you, Mr. Tanner, a letter from Mr. Furnish dated August 12, 1994; is that correct?
A.      That's correct.
Q.      And you were referred to page two of that letter, which makes reference to 1,891 rooms; is that correct?
A.      That's correct.
Q.      At the time this letter was sent, and at the time you were initially having to contact Opryland Hotel, you were considering meeting at Opryland in either '95, '96 or '97, isn't that correct?
A.      I think when this was under consideration, we pretty much narrowed it down to I guess it would be '95. I don't recall.
Q.      Look at the last paragraph in the letter. It makes reference to information regarding '95, '96 or '97 dates. Do you see that? Last sentence of the letter.
A.      Yes, sir.
Q.      And so you were still considering '95, '96 and '97 at that point, isn't that correct?
A.      We had – we wanted to go to Opryland, and we wanted to go there whenever we could.
Q.      On page three of the letter, there is a discussion in the first paragraph regarding the Delta addition; is that correct?
A.      Yes, sir.
Q.      So when you got this letter, you knew that the Delta expansion would be completed by June 1996, because that's what the letter says, doesn't it?
A.      Yes, sir.
Q.      And you knew that once the Delta expansion was completed, that would add 979 rooms; is that correct?
A.      Yes, sir.
Q.      So you knew as of June '96 there would be a total of 2,870 rooms at that time; isn't that correct?
A.      According to this letter.
Q.      And you got the letter before you signed the contract, didn't you?
A.      Yes, sir.
Q.      So you knew before you signed the contract that if you came in '95, or, excuse me, that if you came in '96, there would be 2,870 rooms, you knew that before you signed the contract, didn't you?
A.      No, sir, I believe that – our understanding was that they hoped, but they could not guarantee completion.
Q.      But you knew that they expected in June of 1996 that there would be 2,870 rooms?

A. But that never entered into our conversation that we had with Mr. Furnish that this was a possibility, other than in this letter. All of our planning centered around the eighteen hundred rooms.

Q. But the 2,870 rooms is in the letter?

A. Yes, sir, it is in the letter.

Q. And my question is, you knew as of June, 1996, the hotel was expecting to have 2,870 rooms; is that correct?

A. That's correct.

Mr. Robert A. Sigel, President and CEO of Millbrook, prior to making his decision to cancel the 1996 convention at Opryland, conversed with representatives of Opryland. The transcript of evidence reveals:

Q. During the time that the choice was being made and the options were being considered, did you ever contemplate using any part of the hotel other than the part which was in existence at the time the contract was made?

A. Absolutely not. I was not aware of any construction taking place, and only on the number of rooms that we were looking at and reviewing at the time we signed the contract.

Q. When it appeared that cancellation was an option on the table, did you have a conversation with Mr. Furnish?

A. Yes, I did. I called Mr. Furnish to talk to him about the situation, told him that we had expanded our requirements, and confirmed with him my conversation with Steve and Jim, insofar as there were not a number of rooms that were available. Told Mr. Furnish that using another facility would not be possible, and tried to ascertain from him what he thought our liability might be in the event we opted to cancel formally.

Q. And what did he say?

A. He said that the Opryland Hotel had a history of near-full capacity, especially over the summertime, that we would not, in his opinion, incur any significant liability. I asked him to put a number on that. He said five to ten thousand dollars.

MR. BOOKER: Your Honor, I want to object to this line of testimony. It sounds like it might be for some type of estoppel defense, a defense that hasn't been pled. So I would suggest that it's not relevant to an issue in this case.

MR. FISHER: I say it is relevant because when the testimony is finished, I believe it will shed some light on what part of the hotel they were talking about. I'm not claiming any sort of estoppel.

THE COURT: If he's not claiming estoppel, then it is permissible. And I don't believe they've raised estoppel. But I do believe that they raised the language of the contract.

MR. BOOKER: I guess what I'm trying to avoid is where testimony comes in, and after trial he says it's come in, and we want to have a verdict based on the proof presented. I just want to make sure there's not any estoppel defense being raised now.

MR. FISHER: I'm not raising estoppel on that.

THE COURT: I believe if he was raising estoppel, he would have done that. But we'll let it go forward on the basis that he says.

Q. During the conversation with Mr. Furnish about cancellation and what if you canceled, was there ever any mention that the rooms in the Delta addition would be figured into the unsold rooms?

A. Absolutely not. No admonition, no voice concern, no expression that we would have any significant liability whatsoever. It was very clear to me that there would be some small amount, and that was it. And I was making that decision based on discussions we had as a group with Mr. Ettman,

> Mr. Tanner. And I reviewed the contract, the number of room nights, and the thought in my mind as to the probability that those room nights could be resold by Opryland Hotel at that time.

It is difficult to see how Mr. Sigel could fail to have known about the Delta wing after the letter of August 12, 1994, but this matters little since he acknowledges that Steve Tanner was in charge of the convention for Millbrook.

The most troubling part of the two transcript excerpts quoted above – and the entire discussion of the parties' contemplation – is Millbrook's ultimate use of "Delta" rooms to lessen its liability. The hotel had 2,753 rooms occupied on July 11, 1996; 2,786 rooms occupied on July 12, 1996; 2,605 on July 13; 1,938 on July 14; 2,095 on July 15; 2,033 on July 16, and 1,839 on July 17. None of these numbers, save the July 17 occupancy, could have been possible without considering the Delta wing. Thus, Millbrook seeks a construction of the contract that caps their room maximum at 1,891 but then uses the Delta wing, which Millbrook never considered for any purposes, as a means of reducing or eliminating their unsold room night obligation following cancellation.

When all of the documents are considered in the light of the actions of the parties throughout this controversy, it is apparent that the 1996 Millbrook convention contemplated the entire 2,870 rooms of the Opryland Hotel, existing and useable as of July 11, 1996.

Such decision is mandated by the rule that the "Court, placing itself in the position of the contracting parties, considers all the facts and circumstances so as to ascertain what the parties intended, the primary purpose being to ascertain just what was within the contemplation of the parties." *Fidelity-Phenix Fire Ins. Co. of New York v. Jackson*, 181 Tenn. 453, 468, 181 S.W.2d 625, 631 (Tenn. 1944).

While generally in cases involving breach of contract the burden rests upon the defendant to establish matters in mitigation of damages, *Jeffers v. Stanley*, 486 S.W.2d 737 (Tenn. 1972), we are not dealing in this case with a breach of contract. This contract contained detailed cancellation provisions and

an affirmative duty upon Opryland to resell the Millbrook rooms after cancellation. The record does not establish any basis by which the court can determine which room nights were sold after cancellation in the Delta wing and in the pre-Delta hotel. All rooms sold subsequent to cancellation will therefore be credited to Millbrook with a resulting total damages to Opryland of $170,690.00.

The action of the chancellor in determining that the contract precluded any recovery for advertising expense is eminently correct and is affirmed.

Estoppel is specifically disavowed by Millbrook and the finding of the chancellor that the Delta wing of the hotel was not contemplated for the July 1996 Millbrook convention is against the preponderance of the evidence and therefore reversed.

The action of the chancellor is thus reversed in part, affirmed in part, and the cause is remanded for further proceedings consistent with this opinion, including the proper entry of judgment awarding the cancellation fee of $170,690.00.

Costs are assessed against the appellee for which execution may issue.

_____
WILLIAM B. CAIN, JUDGE


CONCUR:


_____
BEN H. CANTRELL, P.J., M.S.


_____
WILLIAM C. KOCH, JR., JUDGE


15